### FAVORS et al. v. RANDALL et al.
### No. 1474.

District Court, E. D. Pennsylvania.
July 9, 1941.

744

Saul C. Waldbaum, Morris Shafritz, and Theodore Spaulding, all of Philadelphia, Pa., for plaintiffs.

Abraham L. Freedman, Fred Wolf, Jr., and John E. Power, Jr., all of Philadelphia, Pa., for defendants.

Thomas J. Curtin, Asst. U. S. Atty., and Gerald A. Gleeson, U. S. Atty., both of Philadelphia, Pa., for U. S. Housing Authority.

GANEY, District Judge.

The complainants have asked for a preliminary injunction against the defendants praying that the defendants be restrained from certifying for occupancy, to what is known as the Tasker Street Project, certain tenants on the basis of color or race; that the defendants be compelled to modify the quota eligibility, of families selected for certification, where the income totally or partially is derived from public or private relief, and that the defendants be enjoined, during the pendency of this action, from certifying for occupancy any further tenants in the Tasker Street Project, as well as damages against the individuals above named.

The Philadelphia Housing Authority is a public corporation created pursuant to the Housing Authorities Law of Pennsylvania, Act of May 28, 1937, P.L. 955, 35 P.S.Pa. § 1541. The United States Housing Authority is a Federal corporation created by the United States Housing Act of 1937, Act of September 1, 1937, 42 U.S.C.A. § 1401.

■ The purposes for which the Philadelphia Housing Authority was created was to effect the clearance of certain slum areas within the confines of the City of Philadelphia, and to provide in their place and stead, safe and sanitary dwelling accommodations for families of very low incomes. The purpose of the Housing Authority Law was to make certain loans to the various local housing authorities throughout the United States, or in effect to provide for annual subsidies by which dwelling accommodations could be erected at less than what has been termed the "economic rent", or in other words, the creation of housing facilities which could not otherwise be constructed by private capital for people in the very low income groups.

The original program of the Philadelphia Housing Authority contemplated the erection of six projects within the city by which partial provision was to be made for persons in low income groups, by way of sanitary housing facilities, it being impossible to take care of everyone within these groups, who wished the facilities afforded, with only the six projects. The six projects contemplated were the Southwark Site, the Germantown Site, the Pennsylvania Hospital Site, the Glenwood Project, the Poplar Project and the Tasker Project. However, the first three projects had to be abandoned by reason of the council of the City of Philadelphia refusing to adopt proper legislation approving them, which left the latter three the only three projects available for the forementioned low income groups. The three projects consisted of twenty-eight hundred fifty-nine (2859) dwelling units, out of which five hundred thirty-five (535) are at Glenwood, one thousand (1,000) at Tasker and thirteen hundred twenty-four (1,324) at Poplar. The Glenwood project has been completed and is now occupied, the Poplar project is presently under construction and the

Tasker Street Project is completed and families were at time of the beginning of this action, being certified for occupancy, as well as executing leases.

The Philadelphia Housing Authority entered into a Loan and Annual Contributions Contract on November 30, 1940, with the United States Housing Authority. The contract included three projects, the Glenwood, the Poplar and the Tasker Street, and included the provisions and terms by which the loan for the annual subsidy was made. Part two (2) of the Loan and Annual Contributions Contract, known as "Terms, Covenants, and Conditions", provides in Section 4.04 that: "It (the local authority) will not discriminate in the selection of tenants because of religious, political, or other affiliations."

Section 3.07(c) of a Management Resolution provided as follows: "There shall be no discrimination because of race, religious, political, personal or other affiliations, in the selection of tenants for admission."

A Federal Census conducted in 1940 by the W. P. A. under a Real Property Survey, showed that within the city subject to the Philadelphia Housing Authority's jurisdiction, families in the income bracket who would be served by the Authority's program, that is, those who live in slum areas and under unsanitary living conditions, and who did not have the earning capacity to provide for themselves clean and healthful living accommodations, consisted of sixty percent (60%) white families and forty percent (40%) colored families. By reason of the shrunken program occasioned by the refusal of the City of Philadelphia to take care of the other three projects, the Authority contemplated Glenwood as virtually a negro project inasmuch as it was in a location surrounded by negro inhabitants and of the five hundred thirty-five (535) units available, five hundred (500) were allotted to negroes. Likewise the Poplar Street Project which is also surrounded by colored people, having a ninety percent (90%) perimeter of colored people, was also regarded by the Authority as a predominately colored unit. The area immediately surrounding the Tasker Project, covering a four block area as established by the 1940 Federal Census show that ten percent (10%) only of the families in this area are negro and ninety percent (90%) white.

In view of this shrunken program the defendants, members of the Phila. Housing Authority labored with the question of policy as to the certification of white and negro occupants from December, 1940, until they adopted the following Resolution on April 24, 1941:

"Resolved: That The Philadelphia Housing Authority hereby determines that in the selection of tenants for Tasker Homes, the existing neighborhood pattern be preserved as far as possible."

The Tasker Street Project which is the project in which the complainants allege they have been discriminated against has one thousand (1,000) living units, for which there are four thousand, three hundred six (4,306) applicants, of which three thousand, two hundred sixty three (3,263) were white and ten hundred forty (1,040) colored. The tenants finally selected as of the date of the bill numbered seven hundred fifty eight (758), seven hundred and two (702) of which were white and fifty-six (56) colored. According to the census computation of 1940, if the policy of the Authority adopted in its Management Resolution of April 24, 1941, in selecting tenants in conformity with the neighborhood pattern is carried out on the three projects, which are the only ones presently available, there will be seventeen hundred (1,700) colored units occupied and eleven hundred fifty nine (1,159) white units occupied, which is the opposite of the need existing, as found by the census, since where the need shows forty percent (40%) colored, the supply of that need shows sixty percent (60%) colored, and where the need shows sixty percent (60%) for white persons, the supply shows only forty percent (40%) for them. The testimony further shows that if the Tasker Street Project would accept tenants on an even basis, fifty percent (50%) white and fifty percent (50%) colored, it would show a total on the three projects of twenty two hundred (2,200) colored units to six hundred fifty nine (659) white units, thus still throwing further out of balance the proportion of need as shown by the 1940 Census.

There is definite indication on the record that from December 26, 1940, to April 24, 1941, white people were certified for occupancy over negro applicants, since as of December 26, 1940, there were seventy-seven (77) persons certified for occupancy, of whom sixty-two (62) were white and fifteen (15) were negro. From December 26,

1940, to April 24, 1941, only seven (7) colored persons were certified. The record further shows that on April 3, 1940, there were six hundred eighty-three (683) white families certified and ten (10) negro families certified. Therefore, as has been indicated, there can be no doubt but that the Authority certified white tenants who made application for occupancy and did not certify negroes.

■ The defendants, after the complainants had offered all their testimony, without offering any defense made a motion to dismiss the complaint, pursuant to Rule 41(b) of the New Rules of Civil Procedure, 28 U.S.C.A. following section 723c, thereby averring that on the facts and the law the plaintiffs had shown no grounds for relief.

It is the plaintiffs' contention that the action of the Housing Authority previous to April 24, 1941, and the adoption of the Management Resolution, setting a policy for the selection of tenants for the project, in conformity with the neighborhood pattern, is violative of the Fourteenth Amendment to the Constitution of the United States, which provides:

"Section 1. * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. * * *

"Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

Further that this conduct also is allegedly violative of the Act of April 20, 1871, Revised Statutes § 1979, now Section 43, Title 8 U.S.C.A., which provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Jurisdiction of this Court is derived from Section 41, Subsection 14 of Title 28. U.S.C.A.: "where the matter in controversy exceeds $3000 and arises under the Constitution or laws of the United States."

■ The facts as set forth in the bill make a proper ground for an application for a preliminary injunction in conformity with the rule as set forth in Warner Bros. et al. v. Gittone, 3 Cir., 110 F.2d 292, since if the policy adopted by the defendants is discriminatory and denies to the plaintiffs the equal protection of the law, there is an irreparable loss and damage to the complainants, for the testimony shows that at the time of the application for the bill eighty percent (80%) of the families certified for occupancy on the Tasker Street Project of one thousand (1,000) available units, were white, and if the basis for the further certification is the Management Resolution of April 24, 1941, the percentage would be still higher, and would thus deny the complainants the right of occupancy, which if they are so entitled, would be foreclosed by the present method of certification.

Accordingly, it is then necessary to pass to a consideration of the case upon its merits, and this concerns itself with whether the policy of the Board previous to April 24, 1941, and the Management Resolution of that date, the Housing Authority being admittedly a state agency, is violative of the equal protection clause of the Fourteenth Amendment and the legislation enacted in pursuance thereof. Following the Civil War certain amendments to the Constitution were adopted which have become integral parts of that instrument, equally binding upon all the states and fixing certain fundamental rights which all are bound to respect. The Fourteenth Amendment made all persons born or naturalized in the United States, citizens of the United States and of the state in which they reside, and provided that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States and that no state shall deprive any person of life, liberty or property, nor deny to any person the equal protection of the laws. While the principal purpose of the amendment was to protect persons of color, the broad language used has been deemed sufficient to protect all persons, white or black, against discriminatory legislation by the states; this is now the settled law. In many of the cases since arisen, the question of color has not been involved, and the cases have been decided upon alleged violation of civil or property rights, irrespective of race or color of the complainant.

██ The courts have on many occasions passed on the construction to be given to the equal protection clause of the Fourteenth Amendment, and at this date there can be no doubt, but that any state action which denies to any person within its jurisdiction the equal protection of the laws runs afoul of the constitutional provision. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664. As was said by the court in Ex Parte Virginia, 100 U.S. 339, 347, 25 L. Ed. 676, "Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State". Therefore, as a result of the adoption of the Fourteenth Amendment to the United States Constitution, a state is required to extend to its citizens of the two races, white and black, substantially equal treatment in the facilities it provides from the public funds. Accordingly, the authorities hold that to single out a certain portion of the people by the arbitrary standard of color, and say that these shall not have rights, which are possessed by others, denies to them the equal protection of the laws. State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; University of Maryland v. Murray, 169 Md. 478, 182 A. 590, 103 A.L.R. 706. The courts have many times recognized the obligation of the state to provide negroes with the same advantages or substantially equal to the advantages, afforded to white persons, and in so doing the courts have held that the obligation is satisfied by the state when it furnishes facilities to negroes, equal to those offered to whites, as in separate school accommodations and pullman car privileges. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; Mitchell v. United States, 61 S.Ct. 873, 85 L.Ed. 1201, decided by the Supreme Court of the United States on April 29, 1941. As was very pertinently stated by Justice Brown in Plessy v. Ferguson, supra [163 U.S. 537, 16 S.Ct. 1140, 41 L.Ed. 256]:

"The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power."

██ Since it can no longer be doubted therefore that proper segregation, that is the affording of equal facilities to both races thus separated, is not within the inhibition of the Fourteenth Amendment and the legislation enacted pursuant thereto, the only question remaining for decision is whether or not the action of the Philadelphia Housing Authority in certifying tenants in conformity with the neighborhood pattern is a reasonable regulation or a discrimination, arbitrary, illegal and unjust.

██ A thorough examination of the testimony, it is felt, shows that the action of the defendants is neither arbitrary, discriminatory nor illegal. In view of the scope of the problem which confronted the Philadelphia Housing Authority, after the collapse of one-half of its program, it is felt that far from being discriminatory or arbitrary the Authority in the performance of the duties incumbent upon them has met and is meeting the problem with forbearance and tolerance as is evidenced by the fact that when the program is completed, although the need is much greater among white people for low "economic rent", nevertheless, there will be a much greater preponderance of negroes in occupancy of the various units, than their need entitles them to.

██ The conduct of a state agency which as here merely implies a legal distinction (basing selection of tenants certified on neighborhood pattern) between the white and colored races, a distinction which is founded on the color of the two races and which must always exist, so long as white men are distinguished from other races by color, has no tendency to destroy the legal equality of the two races. The argument cannot be accepted that equal rights cannot be secured to the negro, except by an enforced commingling of the two races. Neither the Thirteenth, Fourteenth, nor Fifteenth Amendments to the

United States Constitution operate to make the negro race wards of the nation. In determining the question of reasonableness, the Philadelphia Housing Authority was at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the preservation of public peace and good order as well as a promotion of their comfort, which was the purpose for the creation of the Authority. This it is felt the Philadelphia Housing Authority has carefully done.

The application for the preliminary injunction is denied.