260 P.2d 668]

[Civ. No. 15693. First Dist., Div. One. Aug. 26, 1953.]

MATTIE BANKS et al., Respondents, v. HOUSING AU-
THORITY OF THE CITY AND COUNTY OF SAN
FRANCISCO et al., Appellants.

2

Roth & Bahrs for Appellants.

Francois & Metoyer, Nathaniel S. Colley and Loren Miller for Respondents.

WOOD (Fred B.), J.—The Housing Authority of the City and County of San Francisco, its members, and its executive director, have appealed from a judgment which ordered the issuance of a peremptory writ of mandate requiring them "1. To certify forthwith petitioners, Mattie Banks and James Charley, Jr., for admission to any units in any permanent public low rent housing development under respondents' ownership and control, subject only to the same rules, regulations, and preferences applicable to other applicants, and without regard to race or color; 2. To institute forthwith a policy and practice of applying the same set of standards in determining eligibility to all applicants for permanent public low rent housing developments and without regard to race or color; 3. To institute forthwith a policy and practice of processing the applications of petitioners and other Negro applicants as expeditiously as all other applications for permanent low rent housing accommodations are processed; 4. To institute forthwith a policy and practice of recognizing the preferences as set forth in Section 302 of the Housing Act of 1949;* 5. To institute forthwith a practice, program, and policy of admitting all qualified applicants to any and all available units in any and all permanent public low rent housing developments under respondents' management and

---

*63 U.S. Stats. at Large (1949), part 1, ch. 338, p. 413 at 438; 42 U.S. Code 1410, subd. (g).

control subject only to the rules and regulations applicable to all applicants alike and without regard to race or color.''

The judgment also decreed that ''the policy, custom, practice, and usage of respondents in refusing to lease or rent to petitioners, to other persons of Negro descent, or to any other applicant because of the race or color of such applicant, units in certain permanent low rent housing developments under the ownership and control of said respondents, whether it be pursuant to the so-called 'neighborhood pattern' policy or for any reason whatsoever, is hereby declared to be illegal and void and in violation of the equal protection clause of the 14th Amendment to the Constitution of the United States and contrary to the public policy of the State of California, and the City and County of San Francisco.''

The ''neighborhood pattern policy'' mentioned was declared in a resolution adopted by the housing authority May 28, 1942, expressed in these words: ''1. In the development of its program and the selection of its tenants this Authority shall provide housing accommodations for all races in the proportion which the number of low income families otherwise unable to obtain decent, safe and sanitary dwellings in each racial group, bears to one another. 2. In the selection of tenants for the projects of this Authority, this Authority shall act with reference to the established usages, customs and traditions of the community and with a view to the preservation of public peace and good order and shall not insofar as possible enforce the commingling of races, but shall insofar as possible maintain and preserve the same racial composition which exists in the neighborhood where a project is located.''

February 24, 1950, appellants entered into an agreement with the city and county of San Francisco whereby these proportionate needs and neighborhood pattern policies were abrogated to the extent of making them inapplicable to projects initiated subsequent to July 15, 1949. As to such projects the agreement provides that the housing authority ''shall avoid or refrain from any policy or practice which results, directly or indirectly, in discrimination or any form of segregation by reason of race, color, religion, national origin or ancestry.'' But the agreement also provides in effect that the proportionate needs and neighborhood pattern policies shall continue in full force and effect as to projects initiated prior to July 15, 1949. Thus, it appears that these policies continue to apply to the projects known as Holly

Courts, Potrero Terrace, Sunnydale, Valencia Gardens, West-side Courts, North Beach Place, and Ping Yuen.

E. N. Ayer, chairman of the housing authority, testified that the neighborhood pattern policy was intended to localize occupancy of Negroes and other racial groups in certain projects; that in accordance with this policy Westside Courts was for the occupancy of Negroes and that no Negro whether a veteran or nonveteran, regardless of his qualifications and priorities, would be admitted to the North Beach project, nor to any of the above named projects except Westside Courts.

John W. Beard, executive officer of the housing authority, testified that each of the projects named is a permanent low rent housing project available only to low income families, under federal and state laws. Among such families there are certain preferences. Families displaced by a project have the first preference. Among them, families of disabled veterans come first, those of veterans and servicemen come next, and finally the remaining displaced families. Next come low income families not displaced by the project. Among them the same priorities obtain: i.e. families of disabled veterans come first and those of veterans and servicemen second. When other factors are equal, families of the lowest income and in greatest need of better housing are preferred. Residence in San Francisco is a prerequisite in all cases. The time of filing an application is not a factor in determining the indicated preferences.

Beard further testified that on September 19, 1952, there were no Negro occupants of any of the projects above named except Westside Courts which had 136 Negro tenants and no white tenants. He said that "the racial contents in these projects is the result of the program passed by the Housing Commission [Corporation]." The housing authority instructed Beard that they were to be occupied by white families. As to projects thus indicated for occupancy by white families, if a Negro who had a preference (such as a disabled veteran who had been displaced by the construction of the project) were to apply, he would not be admitted because of his not being a white person. The instruction given Beard by the housing authority concerning Westside Courts was for dominantly Negro occupancy, permitting up to 20 white occupancies. Ping Yuen was wholly occupied by Chinese. A white person otherwise qualified would be deemed acceptable for admission to any of the named projects except Westside

Courts and Ping Yuen. If a Negro, he would be considered only for Westside Courts.

These seven projects, already constructed and occupied or ready for occupancy, provide 2016 family units, of which Westside Courts has 136 and Ping Yuen 174 units. Additional projects under construction would provide 713 additional units, and there were projects in the preconstruction stage which would provide 1,892 additional units. There were in contemplation projects which would provide a total of 5,826 dwelling units.*

Beard further stated that a survey had been made upon the basis of which it was estimated that of the families potentially eligible for admission to low rent housing projects, 70 per cent are white and 30 per cent are nonwhite. The latter group includes Chinese and other races but consists substantially of Negroes. He said it is contemplated that when the projects yet to be built are completed the dwelling units will be so distributed among white and nonwhite families that 70 per cent of them will be occupied by white and 30 per cent by nonwhite families.

Appellants put in evidence an exhibit dated March 20, 1952, entitled "Overall Program for Local Authority," which indicates that at the time of its preparation the appellant housing authority had active projects totalling 1,741 dwelling units occupied by 1,600 white and 141 nonwhite families; deferred projects totalling 1,142 units, to be occupied by 711 white and 431 nonwhite families; and projects "under Program Reservation" totalling 2,973 units, to be occupied by 1,784 white and 1,189 nonwhite families. This exhibit contains an estimate that when the entire program is completed there will be 5,856 dwelling units occupied by 4,095 white and 1,761 nonwhite families, respectively, or 70 per cent white and 30 per cent nonwhite.

Thus, appellants' claim, the proportionate needs and neighborhood pattern policies will ultimately provide low rent housing accommodations for potentially eligible white and nonwhite families in the very proportion (70 per cent and 30 per cent) which a survey made in 1950 indicates in fact obtains

*Appellants have not directed our attention to anything in the record, nor have we found anything in the record indicating whether it is certain that the prospective projects will be built, or when. The San Francisco Chronicle of August 25, 1953, carried a news item to the effect that on August 24th a federal order was made eliminating two low rent public housing projects planned for San Francisco.

in the city and county of San Francisco. That survey, according to this same exhibit, shows that 23,202 families occupy substandard dwelling units, of whom 16,303 (70 per cent) are white and 6,899 (30 per cent) are nonwhite.

In support of their appeal, appellants claim: (1) There is no constitutional inhibition against segregation by races ''if the facilities offered or the protection afforded are separate but equal,'' and that their proportionate needs and neighborhood pattern policies satisfy this requirement; (2) the public policy of this state does not make segregation *per se* unlawful; (3) the public policy of the city and county of San Francisco does not forbid the segregation here involved; (4) the evidence does not support the finding that petitioners Mattie Banks and James Charley, Jr., are eligible for housing accommodations, and the trial court had no right to substitute its judgment for that of appellant housing authority on that issue; (5) there was a lack of indispensable parties to this action; (6) this is not a representative suit; (7) mandamus is not the proper remedy.

(1) *The principal issue thus presented turns upon the applicability to the facts of this case of those provisions of the 14th Amendment of the Constitution of the United States which declare* that no *state* shall ''deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.''

Appellants appropriately and commendably concede that action ''by a housing authority* establishing a policy of segregation in accordance with a so-called 'neighborhood pattern' '' is *state* action ''by one of its official branches or agencies just as the state was acting through its judicial branch in *Shelley* v. *Kraemer*,'' 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441].

 The question presented is primarily one of equality of treatment of the ''persons'' affected. The Constitution speaks of the individual, not of the racial or other group to which he may belong. It prohibits a state from arbitrarily discriminating against ''any person.''

Does the distribution of public housing on the basis of the proportionate needs of racial groups (white and nonwhite,

---

*Appellant housing authority was created and its functions are defined by state statute. (Deering's Act 3483; now Health & Saf. Code, chap. 1 of part 2 of div. 24, §§ 34200-34368, added by Stats. 1951, ch. 710, p. 1922, at pp. 1947-1960.)

70 per cent and 30 per cent) satisfy the requirement that individuals are entitled to equal protection of the law?

■ Public housing is intended to provide low cost housing for qualified families of low income. No attempt has been made to provide accommodations for all qualified families. The supply of units is limited. The over-all plan, when consummated, will provide but 5,856 dwelling units for 23,202 potentially eligible families. Only one out of each four eligible families can be served. In selecting the one and rejecting the three, appellants must, of course, consider the relative needs of each and the statutory preferences for displaced families, families of disabled veterans and families of veterans and of servicemen.

■ To these factors, as an additional guide to them in making this selection, appellants have added a policy (not expressed in any statute, state or federal) of limiting these dwelling units to racial *groups* on the basis of the proportionate needs of the *groups*, 70 per cent white and 30 per cent nonwhite.

In carrying out this policy appellants have devised a neighborhood pattern policy which underscores and emphasizes the inequalities of the proportionate needs policy. Ultimately the housing authority will have about 1,756 units for the 6,899 eligible nonwhite families. By the time the housing authority had 2,016 units ready for occupancy, but 310 were available for nonwhite families. White and nonwhite families were then being served in the proportion of 85 per cent and 15 per cent, respectively, not 70 per cent and 30 per cent. Moreover, within the nonwhite group, the dwelling units were unequally allotted: 174 to Chinese and 136 to Negroes; i. e., 56 per cent Chinese and 44 per cent Negro, whereas there is evidence that the 6,899 eligible nonwhite families are "substantially" Negro.

The arbitrary character of such a method of selection is too obvious to require elaboration. It bears no relation to eligibility of the individual. It cuts across and disregards every element which conceivably has any bearing upon eligibility of the individual. It is really an arbitrary method of exclusion, a guaranty of inequality of treatment of eligible "persons."

In justification of these "policies" and of appellants' refusal to admit petitioners and others similarly situated, and of their refusal to admit Negro veterans and their families while admitting non-Negro nonveterans, appellants invoke

the "separate but equal" treatment doctrine. That doctrine was enunciated by the Supreme Court of the United States in *Plessy* v. *Ferguson* (1896), 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256], in relation to a Louisiana statute which required railway companies to "provide equal but separate accommodations for the white, and colored races, by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations." (P. 540.) The petitioner took a seat in a coach not assigned to his race. He was ordered by the conductor, under penalty of ejection from the train, to vacate that coach and take a seat in a coach assigned to persons of his race. Upon his refusal to comply, he was forcibly ejected, with the aid of a police officer.

Those were the facts. Obviously, they did not present the question whether there would have been compliance with the Louisiana statute and the 14th Amendment if the railway company had refused admission and passage to petitioner because (1) that particular train had no coach or compartment set aside for his race, or (2) the coach or compartment so set aside was already fully occupied by members of his race. It is an essentially similar lack of accommodations which the appellants furnish under their proportionate needs and neighborhood pattern policies. We do not regard the Plessy case as authority for the legal position which appellants take.

A railway passenger case which shows the legal significance of *un*equal treatment is *Mitchell* v. *United States* (1940), 313 U.S. 80 [61 S.Ct. 873, 85 L.Ed. 1201.] Mitchell, a Negro, having "paid a first-class fare for the entire journey from Chicago to Hot Springs [Ark.], and having offered to pay the proper charge for a seat which was available in the Pullman car for the trip from Memphis to Hot Springs," was "compelled, in accordance with custom, to leave that car and to ride in a second-class car and was thus denied the standard conveniences and privileges afforded to first-class passengers. This was manifestly a discrimination against him in the course of his interstate journey and admittedly that discrimination was based solely upon the fact that he was a Negro. The question whether this was a discrimination forbidden by the Interstate Commerce Act is not a question of segregation but one of equality of treatment. ▮ *The denial to appellant of equality of accommodations because of his race would be an invasion of a fundamental individual*

*right which is guaranteed against state action by the Four-teenth Amendment (McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 160-162 [35 S.Ct. 69, 59 L.Ed. 169]; Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 344, 345 [59 S.Ct. 232, 83 L.Ed. 208]) . . .''* (P. 94, emphasis added.)

The slight demand for first-class railway accommodations, on the part of colored people, was no justification for such unequal treatment. ''We thought a similar argument with respect to volume of traffic to be untenable in the application of the Fourteenth Amendment. We said that it made the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of that right is that it is a personal one. *McCabe v. Atchison, T. & S. F. Ry. Co., supra.* While the supply of particular facilities may be conditioned upon there being a reasonable demand therefor, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. It is the individual, we said, who is entitled to the equal protection of the laws,—not merely a group of individuals, or a body of persons according to their numbers. *Id.* See, also, *Missouri ex rel. Gaines v. Canada,* pp. 350, 351.'' (P. 97.)

In the McCabe case the court held invalid that portion of an Oklahoma statute that permitted railway companies to provide sleeping cars, dining cars and chair cars exclusively for white persons with no similar accommodations for Negroes. In support of the statute it was argued that it did not appear that enough Negroes seek these accommodations to warrant the outlay of providing them. This argument the Supreme Court found was without merit: ''It makes the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one. Whether or not particular facilities shall be provided may doubtless be conditioned upon there being a reasonable demand therefor, but, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. It is the individual who is entitled to the equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which under substantially the same circumstances is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded.'' (235 U.S. 151, 161-162.)

In the Missouri case, the petitioner, a Negro, was refused admission to the law school at the state university, because he was a Negro. The state offered to pay his tuition at some nearby school of good standing. The ". . . fact remains that instruction in law for negroes is not now afforded by the State, either at Lincoln University or elsewhere within the State, and that the State excludes negroes from the advantages of the law school it has established at the University of Missouri." (P. 345 of 305 U.S.) Of the argument that Missouri's offer of scholarships at law schools in the neighboring states afforded substantially equal treatment, the court said: "The basic consideration is not as to what sort of opportunities other States provide, or whether they are as good as those in Missouri, but as to what opportunities Missouri itself furnishes to white students and denies to negroes solely upon the ground of color. The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State. The question here is not of a duty of the State to supply legal training, or of the quality of the training which it does supply, but of its duty when it provides such training to furnish it to the residents of the State upon the basis of an equality of right. By the operation of the laws of Missouri a privilege has been created for white law students which is denied to negroes by reason of their race. The white resident is afforded legal education within the State; the negro resident having the same qualifications is refused it there and must go outside the State to obtain it. That is a denial of the equality of legal right to the enjoyment of the privilege which the State has set up and the provision for the payment of tuition fees in another state does not remove the discrimination.

"The equal protection of the laws is 'a pledge of the protection of equal laws.' *Yick Wo* v. *Hopkins*, 118 U.S. 356, 369 [6 S.Ct. 1064, 30 L.Ed. 220]." (305 U.S. 337, 349-350.) As to the limited demand by Negroes for law school training, the court said: "Here, petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, and the State was bound to furnish him within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race, whether or not other negroes sought the same opportunity." (P. 351.)

In *Sweatt* v. *Painter* (1949), 339 U.S. 629 [70 S.Ct. 848, 94 L.Ed. 1114], it was found that the legal education offered petitioner at the state law school for Negroes was not substantially equal to that offered white students at the University of Texas Law School. The 14th Amendment guaranteed petitioner "legal education equivalent to that offered by the State to students of other races." (P. 635.)

In *McLaurin* v. *Oklahoma State Regents* (1949), 339 U.S. 637 [70 S.Ct. 851, 94 L.Ed. 1149], it appeared that appellant was admitted as a graduate student at the University of Oklahoma, but in the classroom was required to sit in a row specified for colored students; in the library, he was assigned a special table; and in the cafeteria he was required to sit at a table apart from other students. "The result is that appellant is handicapped in his pursuit of effective graduate instruction. Such restrictions impair and inhibit his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession." (P. 641.) "We conclude that the conditions under which this appellant is required to receive his education deprive him of his personal and present right to the equal protection of the laws." (P. 642.)

In *Henderson* v. *United States* (1949), 339 U.S. 816° [70 S.Ct. 843, 94 L.Ed. 1302], the question was "whether the rules and practices of the Southern Railway Company, which divide each dining car so as to allot ten tables exclusively to white passengers and one table exclusively to Negro passengers, and which call for a curtain or partition between that table and the others," violated a federal statute which made it unlawful " 'to subject any particular person, . . . to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; . . .' " (P. 818.)

Appellant was traveling first-class and went to the diner. "In accordance with the practice then in effect, the two end tables nearest the kitchen were conditionally reserved for Negroes. At each meal those tables were to be reserved initially for Negroes and, when occupied by Negroes, curtains were to be drawn between them and the rest of the car. If the other tables were occupied before any Negro passengers presented themselves at the diner then those two tables also were to be available for white passengers, and Negroes were not to be seated at them while in use by white passengers. When the appellant reached the diner, the end tables in question were partly occupied by white passengers but at

least one seat at them was unoccupied. The dining-car steward declined to seat the appellant in the dining-car but offered to serve him, without additional charge, at his Pullman seat. The appellant declined that offer and the steward agreed to send him word when space was available. No word was sent and the appellant was not served, although he twice returned to the diner before it was detached at 9 p.m." (Pp. 818-820.) In holding the statute had been violated, the court said: "The right to be free from unreasonable discrimination belongs, under § 3(1), to each particular person. Where a dining-car is available to passengers holding tickets entitling them to use it, each such passenger is equally entitled to its facilities in accordance with reasonable regulations. The denial of dining service to any such passenger by the rules before us subjects him to a prohibited disadvantage. Under the rules, only four Negro passengers may be served at one time and then only at the table reserved for Negroes. Other Negroes who present themselves are compelled to await a vacancy at that table, although there may be many vacancies elsewhere in the diner. The railroad thus refuses to extend to those passengers the use of its existing and unoccupied facilities. The rules impose a like deprivation upon white passengers whenever more than 40 of them seek to be served at the same time and the table reserved for Negroes is vacant.

"We need not multiply instances in which these rules sanction unreasonable discriminations. The curtains, partitions and signs emphasize the artificiality of a difference in treatment which serves only to call attention to a racial classification of passengers holding identical tickets and using the same public dining facility. *Cf. McLaurin* v. *Oklahoma State Regents, ante,* p. 637, decided today." (Pp. 824-825.)

Although in the Henderson and the Mitchell cases, the court was applying a statute, not the 14th Amendment, the impact of the statute was similar to that of the Amendment and the court in formulating its decision used the same process of reasoning as that followed in the McCabe, the Missouri, the McLaurin, and the Sweatt cases, each a 14th Amendment case.

We find in these decisions full support for the judgment appealed from, none for the position taken by appellants.

There is another line of decisions which tends toward the same end. *Buchanan* v. *Warley* (1917), 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149], involved a city ordinance which

(operating prospectively, not retroactively) forbade any Negro occupancy of a house in any block where the greater number of houses were occupied by white persons. Conversely, it forbade white occupancy of a house in a block where the greater number of houses were occupied by Negroes. Plaintiff, a white person, was suing defendant, a Negro, for specific performance of a contract of sale of a lot in a block in which the majority of houses were occupied by white persons. The sale was contingent upon the buyer's having the right to occupy the property as a residence. Plaintiff successfully claimed that the ordinance exceeded the limitations of the 14th Amendment. Property is more than a mere thing owned, "it includes the right to acquire, use and dispose of it. The Constitution protects these essential attributes of property." (P. 74.) The prohibition expressed in this ordinance was "based wholly upon color; simply that and nothing more." (P. 73.)

The Buchanan ruling was followed in *Harmon* v. *Tyler* (1926), 273 U.S. 668 [47 S.Ct. 471, 71 L.Ed. 831], reversing *Tyler* v. *Harmon,* 160 La. 943 [107 So. 704], relative to an ordinance which forbade the issuance of a building permit for construction of a residence for a Negro in a "white community" or for a white person in a "negro community" without the written consent of a majority of the persons of the opposite race inhabiting the "community or portion of the city to be affected." The ordinance also imposed penalties upon any person who established his home in a community inhabited principally by members of the opposite race, in the absence of written consent of a majority of the latter.

*City of Richmond* v. *Deans* (1930, 4th Circ.), 37 F.2d 712, affirmed a judgment which enjoined enforcement of an ordinance prohibiting any person from using as a residence any building on any street between intersecting streets where a majority of the residences are occupied by "those with whom said person is forbidden to intermarry." The legal prohibition of intermarriage was itself based on race. The trial court held the ordinance void as a violation of the 14th Amendment. The Circuit Court of Appeals agreed, deeming the question identical with that which was decided in the Buchanan and the Harmon cases. The Supreme Court affirmed upon the authority of those two cases. (281 U.S. 704.)

*Shelley* v. *Kraemer, supra* (1948), 334 U.S. 1, involved restrictive covenants against nonwhite use, occupancy or

ownership of certain properties. It was held that although the 14th Amendment did not proscribe private action in the making of these covenants, it did prohibit the state from participating therein by enforcing the restrictions expressed in the covenants. The court expressly reaffirmed the position it had taken in the Buchanan, Harmon, and Richmond cases. These observations in the Shelley case are quite significant: "We have noted that previous decisions of this Court have established the proposition that judicial action is not immunized from the operation of the Fourteenth Amendment simply because it is taken pursuant to the state's common-law policy. Nor is the Amendment ineffective simply because the particular pattern of discrimination, which the State has enforced, was defined initially by the terms of a private agreement. State action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms. And when the effect of that action is to deny rights subject to the protection of the Fourteenth Amendment, it is the obligation of this Court to enforce the constitutional commands.

"We hold that in granting judicial enforcement of the restrictive agreements in these cases, the States have denied petitioners the equal protection of the laws and that, therefore, the action of the state courts cannot stand. We have noted that freedom from discrimination by the States in the enjoyment of property rights was among the basic objectives sought to be effectuated by the framers of the Fourteenth Amendment. That such discrimination has occurred in these cases is clear. Because of the race or color of these petitioners they have been denied rights of ownership or occupancy enjoyed as a matter of course by other citizens of different race or color." (Pp. 20-21.) These statements have added significance, in our case, when read with the further observation that "it would appear beyond question that the power of the State to create and enforce property interests must be exercised within the boundaries defined by the Fourteenth Amendment." (P. 22.)

■ In our case it appears, in a very real sense of the term, that the state through the appellant housing authority "creates" property interests whenever it executes a lease with an applicant for one of its dwelling units. The right so to do must be "exercised within the boundaries of the Fourteenth Amendment." But it is not necessary to rest our decision on that ground. ■ Whether or not it be a

property right which the housing authority "creates and enforces," the state is engaged in furnishing suitable housing accommodations to low income families. This, of course, it must do within the boundaries of the 14th Amendment.

■ As said in the Missouri case, "The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State. The question here is not of a duty of the State to supply legal training, or of the quality of the training which it does supply, but of its duty when it provides such training to furnish it to the residents of the State upon the basis of an equality of right." (305 U.S. 337, 349.) We need only substitute "administrative regulations" for "laws" and "housing accommodations" for "legal training" to make the pronouncement last quoted fit our case perfectly.

■ Appellants by reason of their proportionate racial needs and neighborhood racial pattern policies are not furnishing and have prevented themselves from furnishing housing accommodations to persons of low income "upon the basis of equality of right."

■ Perhaps a few words should be added concerning appellants' "neighborhood pattern policy." They are exercising state power to preserve, perpetuate, and enforce a neighborhood racial pattern wherever they decide to locate and build a housing project. In some instances that pattern may have been created and maintained, until now, by the very type of restrictive covenants which the state, through its judicial branch, is prohibited from enforcing. (See *Shelley* v. *Kraemer, supra,* 334 U.S. 1.) What sort of a 14th Amendment might it be that would, at the same time, countenance active sponsorship and fostering of such restrictions by the executive branch of the state or local government?

However a "pattern" may have developed and become established (whether by way of restrictive covenants, the development of ghetto conditions through economic pressures, or otherwise) the legislative branch may not enforce the pattern, as we have seen in the Buchanan, Harmon, and Richmond cases. Particularly apt in this connection is the recent case of *City of Birmingham* v. *Monk* (1951, 5th Circ.), 185 F.2d 859; certiorari denied by Supreme Court, 341 U.S. 940 [71 S.Ct. 1001, 95 L.Ed. 1367]. It involved a city ordinance which made it unlawful for Negroes to reside in areas zoned as white residential or for whites to reside in Negro

residential zones. Such provisions exceeded the limitations imposed on state action by the 14th Amendment and were, therefore, void. Of especial interest to us is the fact that the zoning was based upon neighborhood patterns of a sort. For example, the ordinance made it a misdemeanor for a member of the colored race to move into and reside in "an area in the City of Birmingham generally and historically recognized at the time as an area for occupancy by members of the white race." (P. 860.)

Nor may the executive branch of government observe, encourage, and foster a neighborhood racial pattern when, as here, such a course of conduct results in unequal treatment of persons otherwise eligible to receive and obtain the housing accommodations which the housing authority was created to furnish on behalf of the state.

Appellants place considerable reliance upon *Favors* v. *Randall* (1941, D.C., E.D. Pa.), 40 F.Supp. 743. The court in that case did find that a local housing authority's selection of tenants, between the white and colored races, in conformity with a neighborhood pattern, did not exceed constitutional limitations. The complainants were asking for a preliminary injunction restraining the housing authority from certifying certain tenants to a certain project on the basis of color or race and from certifying any further tenants to that project during the pendency of the action. Although the opinion indicates the court recognized the basic requirement of equality of treatment it does not clearly indicate that the court's attention was pointedly directed to the fact that the rights of "persons," not groups, were involved under the 14th Amendment. The rationale of the decision seems to be that upon the basis of the facts before it the court felt that the questioned method of selection would work out equitably between the two groups, white and colored; indeed, that the colored group would obtain more housing units than its proportionate needs called for. That, as we have seen, is not the kind of "equal" treatment which the 14th Amendment requires. Moreover, the reported decision indicates that the only action taken by the court was to deny a motion for a preliminary injunction. Any court might well deny a preliminary injunction of the kind there involved and yet come to a quite different conclusion after a trial on the merits. The Favors case does not persuade us to a different view than that which we have expressed concerning appellants' proportionate racial needs and neighborhood racial pattern policies.

Those policies may also run counter to certain provisions of our state Constitution. (See art. I, § 1; the due process clause of art. I, § 13; and the second or concluding clause of art. I, § 21.) However, the parties have not discussed this question in their briefs. For that reason and in view of our conclusion in respect to the 14th Amendment, we need not consider it.

(2) *The bearing, if any, of a state public policy upon the type of segregation under inquiry,* need not be considered, in view of our conclusion concerning the applicability and impact of the 14th Amendment.

(3) *Likewise, the applicable public policy, if any, of the City and County of San Francisco need not be considered.*

No inference is to be drawn that we consider that the segregation policies under inquiry are sanctioned either by a state or by a local public policy.

(4) *As to the eligibility of petitioners, Banks and Charley,* appellants take the position (as parties defendant) of tendering that issue to the trial court for decision in this action and yet of claiming that because the executive director of the housing authority (after suit filed and to enable appellants to answer the petition) made a secret investigation as a result of which he made an ex parte determination that these petitioners are ineligible for any dwelling units, and that under the circumstances of this case, the trial court was without power to overrule that determination and itself decide the issue of eligibility. It necessarily follows, appellants contend, that Banks and Charley were not entitled to bring this action in their own behalf or in behalf of others; hence, judgment should be in favor of appellants and against petitioners including all persons whom petitioners claimed to represent.

Strange would it be if the law committed to a defendant the determination of a plaintiff's capacity to sue, without power in the trial court to make its own determination under the circumstances disclosed in this case.

How did such an inconsistent set of issues arise?

Petitioners alleged that "each of them is in every respect and manner eligible for admission to said . . . housing development; that they have applied for admission thereto and have complied with all known rules and regulations governing admission of tenants . . . that they are willing to comply with all reasonable rules and regulations respecting admission of tenants . . . That respondents [appellants upon this ap-

peal] have arbitrarily refused and do now refuse to admit petitioners or certify petitioners for admission to occupancy of any of said housing developments, except Westside Court, solely because of their race and color and for no other reason.'' (Paragraph VI of the petition.)

Answering the allegations of said paragraph VI, appellants admitted that Banks and Charley had applied for rental of accommodations in the North Beach project but denied ''generally and specifically, each and every, all and singular, the other allegations set forth in Paragraph VI of such petition; and in this respect respondents [appellants] allege that respondents [appellants] investigated the claims of each petitioner, a party hereto, for the purpose of verifying each such claim and, upon such investigation, respondents [appellants] found and concluded that no petitioner named herein is eligible for admission to any permanent low rent housing development.'' (Paragraph V of the answer to the petition.)

Did the appellants thereby present for ''judicial review'' an administrative decision concerning the eligibility of the petitioners, an administrative decision calculated to determine the capacity of the petitioners to sue unless annulled in due course as the result of judicial review.

Their pleading does not read that way. The alleged investigation and determination were made after the filing of the petition, not before. Appellants say in their opening brief ''it was necessary to investigate . . . to enable the Housing Authority to prepare an answer.'' Their pleading comports with that statement, for they allege that *all* of the appellants ''investigated'' and ''found and concluded.'' That speaks of them as parties defendant, not as an administrative agency or tribunal making a determination in the due exercise of its functions as such, for it embraces all of them, the several members and the executive officer of the housing authority as well as the housing authority itself. It reasonably may be interpreted as but a supplemental statement in explanation of their denial of the allegation of eligibility, tendered by the petitioners and the appellants as an issue for the court to decide.

The alleged investigation was conducted by the appellant executive director who concluded, upon the basis of information he obtained from various sources, that Banks and Charley were not eligible. In that process he neither consulted the petitioners nor confronted either of them with any of the information he had obtained nor notified them that the

investigation was under way. In view of those circumstances, and the pleadings, we do not have here a case of judicial review of an administrative proceeding.

At the trial the court heard the evidence offered by both sides and came to a different conclusion concerning eligibility. His findings thereon are supported by substantial evidence and we see no basis for a reviewing court to undertake to substitute its judgment for that of the trial judge on that issue.

Significant, too, is the form of the judgment rendered on that issue. The court did not undertake to declare the petitioners eligible for all time, under all circumstances, for any and all dwelling units under any and all conditions.

Instead, the court ordered that the writ of mandate direct the appellants to certify petitioners, Banks and Charley, "for admission to any units in any public low rent housing development under respondents' [appellants'] ownership and control *subject only to the same rules, regulations and preferences applicable to other applicants, and without regard to race or color.*" (Emphasis added.) This, we think, is a wise and proper provision. It declares and preserves the petitioners' basic rights and privileges without hampering the appellant housing authority in the due exercise of its functions under the laws and regulations governing the administration of the housing projects entrusted to its care.

The trial judge indicated that such was his intent. During a discussion at the close of the trial he said in part, "I could not grant a writ of mandate ordering the Housing Authority to admit, at this time, these two petitioners [there were, for example, a sufficient number of applicants who were veterans to fill the existing vacant units], but I do believe the writ of mandate should be directed . . . directing the Housing Authority to certify them for admission in accordance with the rules and regulations of the Housing Authority and the law as governing the operation of the Housing Authority, without regard to restrictions because of color"; also, that appellants "have the right to exercise a reasonable discretion as to who are fit and proper reasonable risks; otherwise there would be hardly anything for them to do except to take them as they come. And I don't believe that it is the purpose and intent of the statute, to take anyone, regardless of who or what they are. I think it is the intent of our laws in the country today to take them, however, without regard to color."

(5) *Appellants claim that the failure to join the city and county of San Francisco and the federal Public Housing Administration as parties defendant renders the judgment void for nonjoinder of indispensable parties.*

As to the city and county of San Francisco, this claim is predicated upon the cooperation agreement between the city and county and the appellant housing authority whereby the proportionate needs and neighborhood pattern policies are in effect approved as to the seven projects already in operation but disallowed as to projects initiated after July 15, 1949. The trial court, in this action, did not pass upon the validity of that contract as such. Moreover, it appears in evidence that the board of supervisors approved the continuation of these policies as to those projects only after the board was advised that the housing authority had the right to insist upon such continuance, coupled with the fact that the housing authority did so insist.

As to the federal Public Housing Administration, this claim is predicated upon the fact that in the documents upon the basis of which the Public Housing Administration makes federal moneys available to the appellant housing authority, the racial policies of the latter were in effect approved by the Public Housing Administration. The trial court in this action did not pass upon those documents nor adjudicate the rights of the Public Housing Administration based thereon. We have examined the Annual Contributions Contract between the appellant housing authority and the Public Housing Administration. In that document, the housing administration states that the selection of tenants and the assignment of dwelling units are primarily matters for local determination, emphasizes the need for equitable provision for eligible families of all races determined on the approximate volume and urgency of their respective needs for such housing, and declares that urgency of need and the preferences prescribed in the Federal Housing Act of 1949 are the basic statutory standards for the selection of tenants. We do not perceive that that document sets up a relationship which makes the housing administration an indispensable party to this action.

In addition, the appellant housing authority is the responsible administrator of the properties involved, clothed with authority to deal with tenants and prospective tenants, in and out of court, without any apparent need for the city and county or the Public Housing Administration actively to

participate in those dealings or in litigation which may grow out of them.

We do not find in the record anything which demonstrates that a "complete determination of the controversy can not be had without the presence of other parties." (See Code Civ. Proc., § 389.) We conclude that the principles enumerated in *Bank of California* v. *Superior Court,* 16 Cal.2d 516, 523-524 [106 P.2d 879], apply.

(6) *This is a representative or class suit which petitioners, Banks and Charley, properly brought* for their own benefit and for the benefit of the many other persons who are similarly interested, particularly including members of the Negro race eligible or potentially eligible for admission to permanent low rent housing in San Francisco who have been denied admission solely on the basis of race.

A detailed discussion of the applicable legal principles is unnecessary in view of the decisions in *Williams* v. *International etc. of Boilermakers,* 27 Cal.2d 586 [165 P.2d 903]; *Thompson* v. *Moore Drydock Co.,* 27. Cal.2d 595 [165 P.2d 901]; *James* v. *Marinship Corp.,* 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]; *Heffernan* v. *Bennett & Armour,* 110 Cal.App.2d 564, 589-595 [243 P.2d 846].

(7) *We find no merit in appellants' contention that mandamus, being an extraordinary remedy, is not available in this case.* Mandamus has issued in many cases involving actions against a city or other public body. It was said in *Housing Authority* v. *City of Los Angeles,* 38 Cal.2d 853, 870 [243 P.2d 515], that "the court is not bound by precedent in determining what facts and circumstances compel the issuance of the writ but that the writ will issue as against a city or other public body or officer wherever law and justice require such action." See, also, *Walker* v. *City of San Gabriel,* 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383]; *Eby* v. *School Trustees,* 87 Cal. 166, 177 [25 P. 240]; *Roussey* v. *City of Burlingame,* 100 Cal.App.2d 321, 326 [223 P.2d 517]; *Stone* v. *Board of Directors of Pasadena,* 47 Cal.App.2d 749, 754 [118 P.2d 866].

The judgment appealed from is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied September 25, 1953, and appellants' petition for a hearing by the Supreme Court was denied October 22, 1953.