**C. G. GOMILLION et al., Appellants,**

v.

**Phil M. LIGHTFOOT, as Mayor of the City of Tuskegee, et al., Appellees.**

No. 17589.

United States Court of Appeals
Fifth Circuit.

Sept. 15, 1959.

Brown, Circuit Judge, dissented.

Fred D. Gray, Montgomery, Ala., Arthur D. Shores, Birmingham, Ala., Robert L. Carter, New York City, for appellants.

James J. Carter, Thomas B. Hill, Jr., Montgomery, Ala., Harry D. Raymon, Tuskegee, Ala., Hill, Hill, Stovall & Carter, Montgomery, Ala., for appellees.

Before JONES, BROWN and WISDOM, Circuit Judges.

JONES, Circuit Judge.

The Legislature of Alabama passed a statute which changed the boundaries of the City of Tuskegee in Macon County of that State, Acts 1957, p. 185. The boundary changes reduced the area of the municipality. The plaintiffs, appellants here, are Negroes. They brought a class suit in the District Court for the Middle District of Alabama against the Mayor, the members of the City Council, and the Chief of Police of the City of Tuskegee, and the members of the Board of Revenue, the Sheriff, and the Judge of Probate of Macon County, and the City of Tuskegee, alleging that as a result of the realignment of the boundaries most of the Negroes who had formerly lived in the City and substantially all of the Negroes who had been qualified to vote in City elections would no longer reside within the City. No white person resid-

ing in the City as previously constituted was excluded from it by the Act. The named plaintiffs, Negroes who had resided within the City limits as they formerly existed but beyond those limits as they are redefined by the statute, for themselves and others of such class, assert in their complaint that they have been deprived of police protection and street improvements, and have been denied the right to vote in municipal elections and participate in the municipal affairs of Tuskegee. It was averred that the purpose of the passage of the statute was to deny and deprive the plaintiffs of the right of franchise and other rights and privileges of citizenship of the City of Tuskegee.

By the prayer of the complaint the plaintiffs asked for a declaration that the Legislative Act, as applied to the plaintiffs, is in violation of the due process and equal protection clauses of the Fourteenth Amendment and of the Fifteenth Amendment. Temporary and permanent injunctions were sought to restrain the defendants from enforcing the statute as to the plaintiffs and those similarly situated, and from denying them the right to participate in municipal elections and to be recognized and treated as citizens of the City of Tuskegee. The defendants filed a motion to dismiss upon the grounds, variously stated, that the courts of the United States cannot inquire into the purpose of enacting or interfere with the carrying out of State legislation fixing the boundaries of municipalities within the State; and that the suit was, in substance, one against the State of Alabama which these plaintiffs could not maintain. The district court granted the motion to dismiss and in its opinion discussed the questions presented, and thus stated its conclusions:

"Thus this Court must now conclude that regardless of the motive of the Legislature of the State of Alabama and regardless of the effect of its actions, in so far as these plaintiffs' right to vote in the municipal elections is concerned, this Court has no authority to declare said Act invalid after measuring it by any yardstick made known by the Constitution of the United States. This Court has no control over, no supervision over, and no power to change any boundaries of municipal corporations fixed by a duly convened and elected legislative body, acting for the people in the State of Alabama". [167 F.Supp. 410.]

The Court entered a judgment dismissing the action upon the ground that the complaint failed to state a claim against the defendants upon which relief could be granted, and for lack of jurisdiction. From this judgment the plaintiffs have appealed.

A general statement of the powers of States over municipal corporations has been made in these words:

"The creation of municipal corporations, and the conferring upon them of certain powers and subjecting them to corresponding duties, does not deprive the legislature of the State of that general control over their citizens which was before possessed. It still has authority to amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, overrule their legislative action whenever it is deemed unwise, impolitic or unjust, or even abolish them altogether in the legislative discretion, and substitute those which are different. The rights and franchises of such a corporation, being granted for the purposes of government, can never become such vested rights as against the State that they cannot be taken away; nor does the charter constitute a contract in the sense of the constitutional provision which prohibits the obligation of contracts being violated. * * * Restraints on the legislative power of control must be found in the constitution of the State, or they must rest alone in the legislative discretion. If the legislative action in these cases operate injuriously to the municipalities or

to individuals, the remedy is not with the courts. The courts have no power to interfere, and the people must be looked to, to right through the ballot-box all these wrongs." 1 Cooley's Constitutional Limitations, 8th Ed., 393 et seq.

To this rule Professor Cooley notes exceptions but none are here pertinent. A portion of the language above has been quoted with approval by the Supreme Court. Town of Mount Pleasant v. Beckwith, 100 U.S. 514, 529, 25 L.Ed. 699. With fewer words it has been said:

"The power to create or establish municipal corporations, to enlarge or diminish their area, to reorganize their governments or to dissolve or abolish them altogether is a political function which rests solely in the legislative branch of the government, and in the absence of constitutional restrictions, the power is practically unlimited." 37 Am.Jur. 626, Municipal Corporations, § 7.

In an often cited opinion the Supreme Court has thus pronounced governing principles:

"Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state within the meaning of the Federal Constitution. The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may, by such changes, suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right, by contract or otherwise, in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it." Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 46, 52 L.Ed. 151. See City of Pawhuska v. Pawhuska Oil & Gas Co., 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054; City of Trenton v. State of New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937, 29 A.L.R. 1471.

In a leading Florida case it is stated:

"The existence of the power [of a State legislature to establish, alter, extend, or contract municipal boundaries] is freely conceded. But is that power unlimited, and the exercise of it entirely beyond the reach of judicial review in any and all cases? The weight of authority in this country seems to answer this question in the affirmative, and to hold that the legislative power in this regard is practically plenary and

unlimited, in the absence of express constitutional restriction thereof." State ex rel. Davis v. City of Stuart, 97 Fla. 69, 120 So. 335, 341, 64 A.L. R. 1307.

It is a general rule that the "power of increase and diminution of municipal territory is plenary, inherent and discretionary in the Legislature, and, when duly exercised, cannot be revised by the courts." Cooley on Municipal Corporations 106 § 32. See 16 C.J.S. Constitutional Law § 145, p. 706; Cooley's Constitutional Limitations, supra; State ex rel. Davis v. City of Stuart, supra.

 It is not claimed that any provision of the State Constitution is violated. The Alabama Constitution expressly recognizes the legislative power of "altering or rearranging the boundaries" of municipalities. Ala.Const.Sec. 104(18); Ensley v. City of Simpson, 166 Ala. 366, 52 So. 61; State ex rel. Brooks v. Gullatt, 210 Ala. 452, 98 So. 373. Should it be contended that a state constitutional question is presented, such contention should not be submitted, in the absence of diversity of citizenship, to Federal tribunals. We find no necessity to declare the rule that a state legislature may do as it will in altering municipal boundaries unrestrained by any provision of the Federal Constitution to be a rule without exception. We think this case does not present the exception. We need not say, for our purposes here, that there may not be cases where courts can properly inquire as to whether a statute fixing boundaries transcends constitutional limits. We think this is not such a case.

Judicial interposition will be sustained where general obligation municipal bonds have been issued and thereafter a change in boundaries has diminished the extent and value of the property subject to tax liens for servicing the bond issue. In such a case the Federal Constitution prevents the contract obligation of the bonds from being impaired by the reduction of the security pledged for their payment. However, the statute contracting the area is not to be declared void. The City's area would be reduced but the City would have a continuing right and be under a continuing duty to levy taxes upon the territory outside, but which was formerly within, its limits as well as upon its remaining area to provide revenue to meet the maturities of interest and principal on the bonds. Port of Mobile v. Watson, 116 U.S. 289, 6 S.Ct. 398, 29 L.Ed. 620. Cf. City of Sour Lake v. Branch, 5 Cir., 1925, 6 F.2d 355, certiorari denied 269 U.S. 565, 46 S.Ct. 24, 70 L.Ed. 414; Town of Oneida v. Pearson Hardwood Flooring Co., 169 Tenn. 449, 88 S.W.2d 998; 1 Quindry, Bonds and Bondholders 744 § 529.

The members of a municipal corporation, its citizens, are those residing within the municipal boundaries. They and all of them, but none others, are entitled to the benefits, privileges and immunities and they are subject to the burdens and liabilities of the municipalities. Property within an incorporated city or town is subject to taxation by the corporation. So also, as has been observed, land excluded may be subjected to taxation by the municipality to prevent impairment of a contract obligation. Sojourners must comply with the City's police regulations. When a person removes from a municipal corporation he loses his membership and the rights incident to such membership and this is no less true where the removal is involuntary and results from a change of boundaries than where the resident removes to another place. That this is so does not restrict the legislative power to alter municipal boundaries.

It is said by Mr. Justice Jackson, a "fundamental tenet of judicial review that not the wisdom or policy of legislation but only the power of the legislature, is a fit subject for consideration by the courts." Jackson, Struggle for Judicial Supremacy 81. See Hunter v. City of Pittsburgh, supra. In the consideration of statutes the courts will refrain from making inquiry into the motives of the legislature, and will not be influenced by the opinions of any or all the members of the legislature, or of its committees or of any other person. 82 C.J.S. Stat-

utes § 354, pp. 745–746. It has recently been stated that "In testing constitutionality 'we cannot undertake a search for motive.' 'If the State has the power to do an act, its intention or the reason by which it is influenced in doing it cannot be inquired into.'" Shuttlesworth v. Birmingham Board of Education, D.C. N.D.Ala.1958, 162 F.Supp. 372, 381, affirmed 358 U.S. 101, 79 S.Ct. 221, 3 L. Ed.2d 145. An attack was made in the Tennessee courts upon an act of the legislature of that State which altered the boundaries of the City of Nashville. The plaintiffs charged that, among other things, the boundaries were arbitrarily drawn with irregular lines and numerous angles which subjected plaintiffs' property to municipal taxation while excluding other property similarly situated in violation of the due process constitutional provisions. It was alleged that the act was conceived and its passage procured for sinister motives for the purpose of assessing the property of the plaintiffs and excluding the property of others, and this was done pursuant to an agreement between the persons benefited and a few members of the legislature. In holding the allegations insufficient the court said:

"That a bill is inspired by private persons for their own advantage, and to the detriment of others, is clearly not a sufficient reason for holding the law void, when passed. Nor can the courts annul a statute because the legislature passing it was imposed upon and misled by a few of its members in conjunction with interested third parties. If the act in question is unwise and oppressive, the bill may be remedied by repeal or amendment. The courts have nothing to do with the policy of legislation nor the motives with which it is made." Williams v. City of Nashville, 89 Tenn. 487, 15 S.W. 364, 366.

In a case where an issue was presented not wholly dissimilar to that before us, an attack was made on the County Unit System of voting that prevails in Georgia. It was asserted, among other things, that the statute providing for the "System" was unconstitutional because it had the "present effect and purpose of preventing the Negro and organized labor and liberal elements of urban communities, including Fulton County, from having their votes effectively counted in primary elections." It was held by a Three-Judge District Court that the Federal Constitution does not take from states the right to set up their own internal organizations and prescribe the manner of state elections. South v. Peters, D.C.N.D.Ga.1950, 89 F.Supp. 672. The Supreme Court affirmed, although a dissenting opinion took the view that the statute abridged the right to vote on account of color in violation of the Fifteenth Amendment. South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, rehearing denied 339 U.S. 959, 70 S.Ct. 980, 94 L.Ed. 1369.

█ The enactment by a state legislature of a statute creating, enlarging, diminishing or abolishing a municipal corporation is, as has been noted, a political function. It is a governmental act. American Bemberg Corporation v. City of Elizabethton, 180 Tenn. 373, 175 S.W.2d 535. Hence it is an act of sovereignty performed under a power reserved by the Tenth Amendment, 81 C. J.S. States § 2, p. 858. This universally recognized sovereign power should not be restricted by prohibiting its exercise where, as an incidence of it, Negroes would be purposely excluded from the municipality and from participation in its affairs.

█ Our consideration of what we regard to be the applicable rules of law leads us to the conclusion that, in the absence of any racial or class discrimination appearing on the face of the statute, the courts will not hold an act, which decreases the area of a municipality by changing its boundaries, to be invalid as violative of the Fourteenth and Fifteenth Amendments to the United States Constitution, although it is alleged that the enactment was made for the purpose, not appearing in the Act, and with the effect of excluding or re-

moving Negroes from the City and depriving them of the privileges and benefits of municipal membership, including the right to vote in City elections. Since we have reached this conclusion, it follows that the judgment of the district court must be

Affirmed.

BROWN, Circuit Judge, dissenting.

WISDOM, Circuit Judge, concurring specially.

BROWN, Circuit Judge (dissenting).

Feeling that this decision is wrong, I cannot presume to speak for the Court. But in sounding this respectful dissent from the action of my Brothers who are no less sensitive than I to the compelling obligations of the Constitution, I would suggest that the Court itself is troubled by this decision.

Does the Court really mean to apply the absolute of Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 46, 52 L.Ed. 151? It is sweeping and unequivocal:

"In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States."

If this is the law, then why does not the opinion end with it? Why does the Court disavow any purpose to hold that it is a rule without exception?[1]

Does the Court really determine that the question of alteration of municipal boundaries is a "political" matter and hence beyond the scrutiny of the Judiciary? If it means this, then why does it emphasize time and again that the discriminatory purpose does not appear on the *face* of the Alabama Act? If it is a "political" matter beyond judicial scrutiny, then what difference does it make whether the purpose is frankly stated or stealthfully concealed by artful sophistication?[2]

Does the Court mean to recognize that where the purpose of the Act is patent on its face the constitutional guaranty or prohibition is then sufficient to invest the Judiciary with a power to so declare by an effective order? If the Judiciary has the power to strike down what is plainly forbidden, what is there about the nature of the judicial process, traditional notions of separation of powers, or the doctrine of judicial abstention from "political" matters, that robs the Judiciary of its accustomed role of inquiry and ascertainment of legislative purpose?

I do not find the answers to these questions in the Court's opinion. I believe earnestly that analysis will demonstrate that satisfactory answers may not be found either to them, or to others suggested by them. Like analysis will show, I think, that the courts are open to hear and determine the serious charge here asserted.

1. "We find no necessity to declare the rule that a state legislature may do as it will in altering municipal boundaries unrestrained by any provision of the Federal Constitution to be a rule without exception. We think this case does not present the exception. We need not say, for our purposes here, that there may not be cases where courts can properly inquire as to whether a statute fixing boundaries transcends constitutional limits. We think this is not such a case."

2. As much is implied by the Court's statement:
"The enactment by a state legislature of a statute creating, enlarging, diminishing or abolishing a municipal corporation is, as has been noted, a political function. It is a governmental act. American Bemberg Corporation v. City of Elizabethton, 180 Tenn. 373, 175 S.W.2d 535. Hence it is an act of sovereignty performed under a power reserved by the Tenth Amendment. 81 C.J.S. *States* § 2, p. 858. This universally recognized sovereign power should not be restricted by prohibiting its exercise where, as an incidence of it, Negroes would be purposely excluded from the municipality and from participation in its affairs."

The last sentence indicates that *purposeful* exclusion of Negroes has a "sovereign" or "political" immunity regardless of its patent or latent genesis.

## I.

Unlike the inherent ambiguity of a phrase like "due process" or "equal protection" found in the immediately preceding Fourteenth Amendment, the 34 words comprising the Fifteenth Amendment are plain. Their command is clear:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

The idea, implicit in the Court's opinion that being a "political" matter the sanction of the constitutional guaranty is to be found in the self-imposed sense of responsibility of the individual states —here Alabama—is a denial of history.

"A few years experience satisfied the thoughtful men who had been the authors of the other two Amendments that, notwithstanding the restraints of those articles on the states, and the laws passed under the additional powers granted to Congress, these were inadequate for the protection of life, liberty and property, without which freedom to the slave was no boon. They were in all those states denied the right of suffrage. The laws were administered by the white man alone. It was urged that a race of men distinctively marked as was the negro, living in the midst of another and dominant race, could never be fully secured in their person and their property without the right of suffrage.

"Hence the 15th Amendment, which declares that 'the right of a citizen of the United States to vote shall not be denied or abridged by any state on account of race, color, or previous condition of servitude.' The negro having, by the 14th Amendment, been declared to be a citizen of the United States, is thus made a voter in every state of the Union.

"We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all; and on the most casual examination of the language of these amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freemen and citizen from the oppression of those who had formerly exercised unlimited dominion over him. It is true that only the 15th Amendment, in terms, mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them as the fifteenth." Butchers' Benevolent Ass'n of New Orleans v. Crescent City Live-Stock Landing & Slaughter-House Co. (Slaughter-House Cases), 1873, 16 Wall. 36, 71–72, 83 U.S. 36, 71–72, 21 L.Ed. 394.

Tested in this light, these statements of the District Court are compelling indeed. As he declared, in dismissing Appellants' complaint,

"Prior to the passage of Act No. 140, the boundaries of the municipality of Tuskegee formed a square, and, according to the complaint * * * contained approximately 5,397 Negroes, of whom approximately 400 were qualified as voters in Tuskegee, and contained approximately 1,310 white persons, of whom approximately 600 were qualified voters in said municipality. As the boundaries are redefined by said Act No. 140, the municipality of Tuskegee resembles a 'sea dragon.' The effect of the Act is to remove from the municipality of Tuskegee all but four or five of the qualified Negro voters and none of the qualified white voters. Plaintiffs state that said Act is but an-

other device in a continuing attempt to disenfranchise Negro citizens not only of their right to vote in municipal elections and participate in municipal affairs, but also of their right of free speech and press, on account of their race and color." Gomillion v. Lightfoot, D.C.M.D.Ala., 1958, 167 F.Supp. 405, 407.

The conclusion and judgment of the District Court, which we have this day affirmed, is "that the complaint fails to state a claim * * * upon which relief can be granted and that this Court does not have any authority or jurisdiction to declare void this particular duly enacted statute of the State of Alabama." [3] 167 F.Supp. 405, 410. Accordingly, the case must now be measured against the allegations of the complaint which categorically charges purposeful discrimination for race. For, as we have learned from Conley v. Gibson, 1957, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed. 2d 80, "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." And for this purpose the complaint must be taken as true. Glus v.

Brooklyn Eastern District Terminal, 1959, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed. 2d 770, 774.

Considering the procedural context in which this case now finds itself, the Court has permitted the Legislature of Alabama to simply abolish a substantial part of one of its cities, Tuskegee, and thereby disenfranchise all but four or five of its Negro citizens. Almost as anticipating the existence of this invincible power, the legislature is perhaps presently considering using it to eradicate the entire County of Macon.[4]

## II.

Although to me this is an apt illustration of "burn[ing] the house to roast the pig," [5] I agree with much of that said by the Appellees, the District Judge and the majority of this Court. Zoning and districting regulations are primarily for states. Voting regulations are primarily for states. As a general rule, the Constitution of the United States, the Congress, the Federal Courts, and the Executive Branch of the Federal Government are not concerned with such local matters.

This is not to say, however, as the Court's opinion tends to conclude from the Hunter, Beckwith and Laramie

3. The District Court puts it squarely on the basis that the "court does not have any authority or jurisdiction." Another thing still unclear in this Court's opinion is whether it takes a like view or whether in the expression "the courts will not *hold* an act * * * to be invalid * * *" this Court is to be understood as recognizing that it has the power to review—and exercising it—affirmatively finds the act within the constitutional prerogative of Alabama. The Court expresses its conclusion this way:
"Our consideration of what we regard to be the applicable rules of law leads us to the conclusion that, in the absence of any racial or class discrimination appearing on the face of the statute, the courts will not hold an act, which decreases the area of a municipality by changing its boundaries, to be invalid as violative of the Fourteenth and Fifteenth Amendments to the United States Consti-

tution, although it is alleged that the enactment was made for the purpose, not appearing in the Act, and with the effect of excluding or removing Negroes from the City and depriving them of the privileges and benefits of municipal membership, including the right to vote in City elections."

4. An amendment to the Alabama Constitution providing that the legislature "may * * * by a majority vote of each house, enact general or local laws * * * reducing the area of, or abolishing, Macon County * * *" was introduced and passed by the 1957 session of the Alabama Legislature as Act No. 526, p. 720. It was subsequently submitted to a referendum, and approved, December 17, 1957. The Act is reported at 3 Race Rel. L.Rep. 357 (1958).

5. Butler v. State of Michigan, 1957, 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed. 2d 412 (per Frankfurter, J.).

Cases,[6] that the Constitution imposes *no* limitation upon the actions of the states in these areas.

It is axiomatic that in a federal system the laws of the individual states cannot be supreme. For even in a field reserved expressly to the States or to the people it is the Constitution which assures that. The Constitution so prescribes. Article Six of the Constitution provides that "This Constitution * * * shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Moreover, Alabama, like most states, requires that "All members of the legislature, and all officers, executive and judicial, before they enter upon the execution of the duties of their respective offices * * *" must swear to "support the constitution of the United States * * *." Ala. Const. Art. 16, § 279 (1901).

The nearly 360 volumes of the United States Reports are full of the historical story of the occasional conflict between what are in all other respects matters of wholly local concern, and some provision of the Constitution. Needless to say, whenever true conflict has in fact existed, the Constitution has always won out. There is no local matter which is not subject to potential examination for Constitutional defects. To list them all is the task of a case digest or encyclopedia, not a judicial opinion. But a few examples are helpful to illustrate the broad spectrum of constitutional concern.

A mere cursory examination of the following areas will show that they are all typically thought of as matters of nearly exclusive local control. And yet the footnotes indicate some of the familiar cases in which it was determined that, for some reason, the state or local government's treatment was weighed and found constitutionally wanting: local education,[7] transportation,[8] and recreation[9] facilities; athletic contests control;[10] local housing developments;[11] state taxation[12] and educational institutions;[13] what are essentially state judicial procedure matters like admission to the state

6. Hunter v. City of Pittsburgh, 1907, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151; Town of Mount Pleasant v. Beckwith, 1880, 100 U.S. 514, 25 L.Ed. 699; Commissioners of Laramie County v. Com'rs of Albany County, 1876, 92 U.S. 307, 23 L.Ed. 552, D.C., 167 F.Supp. 405, 408–409.

7. Aaron v. Cooper (Cooper v. Aaron), 1958, 358 U.S. 5, 1, 4, 78 S.Ct. 1399, 1401, 1410, 3 L.Ed.2d 3, 5, 17 (Little Rock); Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, Annotation 98 L.Ed. 882, 38 A.L.R.2d 1180; supplemental opinion, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; also companion case, Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (the original "school segregation cases").

8. Gayle v. Browder, 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, affirming per curiam, D.C.M.D.Ala., 1956, 142 F.Supp. 707 (Montgomery busses).

9. Beal v. Holcombe, 5 Cir., 1951, 193 F.2d 384, certiorari denied, 1954, 347 U.S. 974, 74 S.Ct. 783, 98 L.Ed. 1114 (golf course); City of Fort Lauderdale v. Moorhead, 5 Cir., 1957, 248 F.2d 544, affirming per curiam, D.C.S.D.Fla.1957, 152 F.Supp. 131 (same); New Orleans City Park Improvement Ass'n v. Detiege, 5 Cir., 1958, 252 F.2d 122 (park); Kansas City, Mo. v. Williams, 8 Cir., 1953, 205 F.2d 47, affirming, D.C.W.D.Mo., 1952, 104 F.Supp. 848, certiorari denied 1953, 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351 (swimming pool).

10. State Athletic Commission v. Dorsey, 1959, 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028, affirming per curiam D.C. E.D.La.1959, 168 F.Supp. 149 [Judge Wisdom] (statute barring interracial athletic contests).

11. Banks v. Housing Authority of City and County of San Francisco, 120 Cal. App.2d 1, 260 P.2d 668, certiorari denied 1954, Holcombe v. Beal, 347 U.S. 974, 74 S.Ct. 784, 98 L.Ed. 1114 (public low rent housing).

12. Spector Motor Service, Inc. v. O'Connor, 1951, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573.

13. Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (law school); State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (same).

bar,[14] appointment of counsel,[15] enforcement of restrictive covenants,[16] payment of filing fees [17] and furnishing of transcripts [18] for appeal, and the selection of jurors; [19] and even a governor's control of his state's militia,[20] and control of highway safety.[21]

One would be hard-pressed to find an area of "exclusive state action" which has or could not, in some way, by legislative design or administrative execution, be found to be violative of some constitutional provision. This has nothing to do with the occasional strife surrounding overlapping congressional and state legislation. No one here contends that Congress has the right to redistrict Tuskegee or prescribe the qualifications for voting in its municipal elections. But the fact that these are solely, or primarily, the initial concerns of Alabama alone does not mean that when it acts it may act without regard for the Constitution.

The Supreme Court expressed the standard in Cooper v. Aaron, note 7, supra, when they said,

"It is, of course, quite true that the responsibility for public education is primarily the concern of the States, but it is equally true that such responsibilities, *like all other state activity*, must be exercised consistently with federal constitutional requirements as they apply to state action." (Emphasis supplied.) 358 U.S. 1 at page 19, 78 S.Ct. 1401, at page 1410 [3 L.Ed.2d 5 at page 17].

Of course, the same thing could be said of state regulation of voting and zoning.

In Sterling v. Constantin, note 20, supra, the Supreme Court was confronted with the contention that,

" * * * the Governor's order had the quality of a supreme and unchallengeable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the federal government." 287 U.S. 378, at page 397, 53 S.Ct. 190 at page 195.

A contention, it might be noted, which is not altogether dissimilar from that advanced here as to the omnipotence of the Alabama legislature. The assertion was quickly disposed of by the Court in the very next sentence.

"If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, * * *." Id., at pages 397–398, 53 S.Ct. at page 195.

### III.

Nothing in the Hunter, Beckwith and Laramie municipal redistricting cases, note 6, supra, primarily relied upon by the majority and the District Court, alters this view.

Indeed, in those very cases the Supreme Court acknowledged that *some* limitations were to be imposed upon the state's action.

14. Konigsberg v. State Bar of California, 1957, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed. 2d 810; Schware v. Board of Bar Examiners, 1957 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796.

15. Powell v. State of Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

16. Barrows v. Jackson, 1953, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586, Annotation 97 L.Ed. 1602; Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441.

17. Burns v. State of Ohio, 1959, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209.

18. Griffin v. People of State of Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L. Ed. 891.

19. Cassell v. State of Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; Smith v. State of Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; United States ex rel. Goldsby v. Harpole, 5 Cir., 1959, 263 F.2d 71.

20. Sterling v. Constantin, 1932, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375; and see Cooper v. Aaron, note 7, supra.

21. Bibb v. Navajo Freight Lines, Inc., 1959, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed. 2d 1003 (truck mud guard regulations).

"Text writers concede *almost* unlimited power to the State Legislatures in respect to the division of towns and the alteration of their boundaries, but they all agree that in the exercise of these powers they cannot defeat the rights of creditors nor impair the obligation of a valid contract. [citations]

"Concessions of power to municipal corporations are of high importance; but they are not contracts, and, consequently, are subject to legislative control without limitation, *unless the Legislature oversteps the limits of the Constitution.*" (emphasis supplied.) Mount Pleasant v. Beckwith, note 6, supra, 100 U.S. 514, 533, 25 L.Ed. 699.

Moreover, they are not recent cases. Only one was decided in the Twentieth Century, and that over 50 years ago. Racial discrimination was in no way involved. The problems involved concerned property: higher taxes for the annexed city (Hunter), and the liability of a newly created county for the extinguished county's debts (Beckwith and Laramie). Extravagant dicta, taken out of its property context, that "the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States" [22] should not now be spread, some 52 years later, to cover and control our determination of issues of a different area, and of another era.[23]

## IV.

Of course it is true that there are many and varied areas of potential controversy which the courts have held to be, for one reason or another, beyond the limits of judicial relief. These include, for example, the constitutional "guarantee to every State in this Union a Republican Form of Government" [24] (Art. IV, § 4), the congressional regulation of Indian tribes,[25] the legislative and executive control of foreign relations, recognition of foreign governments, and the war powers,[26] control of civilian and military ap-

22. Hunter v. City of Pittsburgh, note 6, supra, 207 U.S. 161, 179, 28 S.Ct. 40, 52 L.Ed. 151.

23. I make no apologies for the view that the business of judging in constitutional fields is one of searching for the spirit of the Constitution in terms of the present as well as the past, not the past alone. I find respectable authority in the words of Chief Justice Hughes in Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 442, 54 S.Ct. 231, 242, 78 L.Ed. 413:

"It is no answer to say that this public need was not apprehended a century ago, or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means today, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation. It was to guard against such a narrow conception that Chief Justice Marshall uttered the memorable warning: 'We must never forget, that it is *a constitution* we are expounding' (McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579); 'A constitution intended for ages to come, and, consequently, to be adapted to the various crises of human affairs.' * * *. When we are dealing with the words of the Constitution, said this Court in [State of] Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641, 'We must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters * * *. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago.'"

24. Pacific States Telephone & Telegraph Co. v. State of Oregon, 1912, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377; Taylor v. Beckham, 1900, 178 U.S. 548, 20 S.Ct. 1009, 44 L.Ed. 1187; Luther v. Borden, 1849, 7 How. 1, 42, 48 U.S. 1, 42, 12 L.Ed. 581.

25. Lone Wolf v. Hitchcock, 1903, 187 U.S. 553, 565, 23 S.Ct. 216, 47 L.Ed. 299.

26. Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 588–589, 72 S.Ct. 512, 96 L.Ed. 586; Hirabayashi v. United States, 1943, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed.

pointing power,[27] or for that matter, the inherent *wisdom* of any executive or legislative policy or specific action,[28] as, for example, taxation.[29]

An outstanding illustration is the Supreme Court's traditional reluctance to grant taxpayers relief against governmental action. As that Court declared in Commonwealth of Massachusetts v. Mellon, 1923, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, regarding a citizen's attack upon a federal appropriation bill,

> "His interest in the moneys of the treasury * * * is shared with millions of others * * *. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained. * * * The party who invokes the power [of courts to declare acts unconstitutional] must be able to show, not only that the statute is invalid, but that he * * * is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

Such reasoning is hardly applicable here. Appellants' complaint is not one "in common with people generally"—only those whose skin is black. And their

suffering is not indefinite: one day voting citizens of Tuskegee, the next they have been deprived of both vote and village.

Nor do the two voter cases applying judicial abstention because the cases were political in nature either justify or compel a different result.

In Colegrove v. Green, 1946, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, Illinois citizens sought a redistricting of the state because of the gross inequality inherent in a range of population in congressional districts of from 112,116 to 914,000. The Court affirmed the dismissal of the complaint "because due regard for the effective working of our Government revealed this issue to be of a peculiarly political nature and therefore not meet for judicial determination." 328 U.S. 549, 552, 66 S.Ct. 1198, 1199, 90 L. Ed. 1432. Again, however, this case involved no consideration of racial issues. The conflict was between rural and urban Illinois, or political parties, not races. And, although some citizens only had one-ninth the vote of others, they were all still permitted to engage in the formality of balloting. It may also be noted that this was not a determination that the districting was constitutional, that the three dissenters felt that the Court should have decided the case, and against the constitutionality of the districting complained of, that Mr. Justice Rutledge's concurring opinion expressed the view that the Court has the power to provide relief in such cases but that here "the cure sought may be worse than the disease," 328 U.S. 549, 566, 66 S.Ct. 1198, 1209, 90 L.Ed. 1432, and that the opinion has come under some criticism. See, e. g., Lewis, Legislative Apportionment and the Federal Courts, 71 Harv.L.Rev. 1057 (1958).

1774; United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 57 S. Ct. 216, 81 L.Ed. 255; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726; Neely v. Henkel, 1901, 180 U.S. 109, 21 S.Ct. 302, 45 L. Ed. 448; Kennett v. Chambers, 1852, 14 How. 38, 50–51, 55 U.S. 38, 50–51, 14 L.Ed. 316.

27. Orloff v. Willoughby, 1953, 345 U.S. 83, 90, 73 S.Ct. 534, 97 L.Ed. 842.

28. Trop v. Dulles, 1958, 356 U.S. 86, 114, 120, 78 S.Ct. 590, 2 L.Ed.2d 630 (dissenting opinion).

29. Commonwealth of Massachusetts v. Mellon, 1923, 262 U.S. 447, 487–488, 43 S.Ct. 597, 67 L.Ed. 1078.

A case of disenfranchisement of Negroes by redistricting has apparently never before arisen. But, as I shall point out in detail, the right of Negroes to vote equally with whites has been jealously guarded by the Supreme Court.

Even in Breedlove v. Suttles, 1937, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252, in which the Court found that Georgia's poll tax did not deny any privilege or immunity of the 14th Amendment, the opinion notes that the otherwise complete freedom of a state to "condition suffrage as it deems appropriate" is "restrained by the Fifteenth and Nineteenth Amendments and other provisions of the Federal Constitution * * *." 302 U.S. 277, 283, 58 S.Ct. 205, 208, 82 L.Ed. 252.

And although the brief per curiam in South v. Peters, 1950, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834, affirming the dismissal of a petition attacking Georgia's county unit voting system for primary elections as violative of the Fourteenth and Seventeenth Amendments, harks back to Colegrove v. Green, supra, and the categorization of "cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions," 339 U.S. 276, 277, 70 S.Ct. 641, 642, 94 L.Ed. 834, it too, does not completely disenfranchise any citizen, is primarily concerned with the urban-rural conflict, and carries a strong dissent, that begins by acknowledging for all, "I suppose that if a State reduced the vote of Negroes, Catholics, or Jews so that each got only one-tenth of a vote, we would strike the law down."

## V.

When a racial discrimination voting issue is clearly posed the Court has evidenced little concern for judicial abstention in "cases posing political issues." Mr. Justice Holmes provided this frontal attack for the Court in the "white primary case" of Nixon v. Herndon, 1927, 273 U.S. 536, 540, 541, 47 S.Ct. 446, 71 L.Ed. 759 "The objection that the subject-matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years * * *. States may do a good ·deal of classifying that it is difficult to believe rational, but there are limits, and it is too clear for extended argument that color cannot be made the basis of a statutory classification affecting the right set up in this case." In Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 761, 88 L.Ed. 987, the Court acknowledged that, "Texas is free to conduct her elections and limit her electorate as she may deem wise, save only as her action may be affected by the prohibitions of the United States Constitution * * *." 321 U.S. 649, 657, 64 S.Ct. 757, 762, 88 L.Ed. 987, and then went on to note that, "the Fifteenth Amendment specifically interdicts any denial or abridgement by a state of the right of citizens to vote on account of color," (Id.) and found the Texas white primary procedure unconstitutional. Its teaching was applied to strike down the Jaybird Association in Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152. Mr. Justice Black reviewed many of the predecessor cases, took note of the fact that the Fifteenth Amendment has been held "self-executing" and declared:

"The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy, obviously applicable to the right of Negroes not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." 345 U.S. at page 467, 73 S.Ct. at page 812.

Not only have the courts uniformly enforced Negro voting rights under the Constitution, but Congress pursuant to the constitutional mandate has for nearly 100 years specifically provided for judicial enforcement of civil rights by legis-

lation.[30] See, e. g., 18 U.S.C.A. §§ 241–243, 28 U.S.C.A. §§ 1343, 1443, 42 U.S.C.A. §§ 1981–1995.

It is of little significance that the Alabama Tuskegee redistricting act under consideration does not, as this Court so greatly emphasizes, demonstrate on its face that it is directed at the Negro citizens of that community. If the act is discriminatory in purpose and effect, "whether accomplished ingeniously or ingenuously [it] cannot stand." Smith v.

[30.] 18 U.S.C.A. § 241:
"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise of enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

18 U.S.C.A. § 242:
"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

18 U.S.C.A. § 243:
Providing that there shall be no discrimination in the selection of jurors and setting a $5,000 fine for violation.

28 U.S.C.A. § 1343:
"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

"(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, *including the right to vote.*" (emphasis supplied)

Paragraph (4) added Sept. 9, 1957, 71 Stat. 637. Legislative history reported at 2 U.S.Code Cong. & Adm.News, pp. 1966, 1974 (1957).

28 U.S.C.A. § 1443:
"Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

"(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

"(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law."

42 U.S.C.A. §§ 1981–1995
1981 (equal rights)
1982 (equal property rights)
1983 (action for deprivation of rights)
1984 (reviewable by Supreme Court)
1985 (action for conspiracy to interfere with civil rights)
1986 (action for failure to prevent interference)
1987 (officers may institute proceedings)
1988 (proceedings in conformity with common law)
1989 (additional commissioners)
1990 (penalty for failure to execute warrant)
1991 (provision for $5 fee for arrests)
1992 (President may request more speedy proceedings)
1993 (repealed)
1994 (peonage abolished)
1995 (new; fine and imprisonment for criminal contempt)

State of Texas, note 19, supra, 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84. Or, as the Court said in Lane v. Wilson, 1939, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281, another case of voting discrimination "The Amendment nullifies sophisticated as well as simple-minded modes of discrimination." Means of disenfranchising Negroes, like fraud, have historically been "as old as falsehood and as versable as human ingenuity." Weiss v. United States, 5 Cir., 1941, 122 F.2d 675, 681, certiorari denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550. And "in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the farmers were not familiar." United States v. Classic, 1941, 313 U.S. 299, 316, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368.

## VI.

The effect of the act is clear. The District Court so found. "As the boundaries are redefined by said Act No. 140, the municipality of Tuskegee resembles a 'sea dragon.' The effect of the Act is to remove from the municipality of Tuskegee all but four or five of the qualified Negro voters and none of the qualified white voters." [167 F.Supp. 407].

Even if the procedural effect of a motion to dismiss for failure to state a claim—admission of allegations—is disregarded the sheer statistics alleged may demonstrate a prima facie purpose of discrimination.

It might well be, as was true in United States ex rel. Goldsby v. Harpole, 5 Cir., 1959, 263 F.2d 71, that if Appellants were ever allowed the opportunity of a trial that "the naked figures [would themselves] prove startling enough." 263 F. 2d 71, 78. In that case, involving exclusion of Negroes from juries, the fact that 57% of the population of Carroll County, Mississippi was Negro and yet no county official "could remember any instance of a Negro having been on a jury list of any kind," without refutation by the State of the reason for such a result was considered enough to prove systematic exclusion of Negroes from the juries of that county. This was the standard of proof of a prima facie case established by such cases as Norris v. State of Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, and Hernandez v. State of Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. And in United States v. State of Alabama, 5 Cir., 1959, 267 F. 2d 808, this Court took note of the allegations that in Macon County, Alabama, the fact that 97% of the eligible whites were registered and *only 8% of the 14,000* eligible Negroes resulted in the fact that whites could outvote Negroes nearly three to one and was at least some evidence, if not proof, of discrimination in registration. 267 F.2d 808, note 3. Perhaps the fact that in the present case the Act in question excludes 99% of the 400 Negro voters from the City of Tuskegee and yet not one single one of the 600 white voters will likewise be considered on the trial as proof enough of the discriminatory and unconstitutional purpose of the Act. But it is again well to point out that the adequacy of the proof in this case is not presently before us as we consider it on the basis of the complaint alone.

## VII.

We need not be that "blind" Court that Mr. Chief Justice Taft described as unable to see what "all others can see and understand * * *." Bailey v. Drexel Furniture Co. [Child Labor Tax Case], 1922, 259 U.S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817. Cited in United States v. Butler, 1936, 297 U.S. 1, 61, 56 S.Ct. 312, 80 L.Ed. 477; United States v. Rumely, 1953, 345 U.S. 41, 44, 73 S.Ct. 543, 97 L.Ed. 770; Uphaus v. Wyman, 1959, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (dissenting opinion 79 S.Ct. 1055). "[T]here is no reason why [we] should pretend to be more ignorant or unobserving than the rest of mankind." Affiliated Enterprises v. Waller, 1 Terry 28, 1 Del. 28, 5 A.2d 257, 261. How it can be suggested that we should, for some reason, not make inquiry in this case is a mystery to me. Many cases could be cited but the most recent example will

do. A little over a month ago, in deciding Harrison v. N. A. A. C. P., 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152, the Supreme Court took note of the District Court's findings that the acts there in question were passed "to nullify as far as possible the effect of the decision of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, (74 S.Ct. 686, 98 L.Ed. 873) * * * as parts of the general plan of massive resistance to the integration of schools of the state under the Supreme Court's decrees." 360 U.S. 167, 175, 79 S.Ct. 1025, 1030, quoting from N. A. A. C. P. v. Patty, D.C.E. D.Va.1958, 159 F.Supp. 503, 511, 515. The dissenting opinion notes the same findings, 360 U.S. 167, 182, 79 S.Ct. 1033, and refers to Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340, and the celebrated Alabama case of Schnell v. Davis, 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093, affirming per curiam, D.C.S.D.Ala.1949, 81 F.Supp. 872. The "legislative setting" surrounding the statute in the latter case was also alluded to in another case decided the same day. Lassiter v. Northampton Election Board, 1959, 360 U.S. 45, 79 S. Ct. 985, 3 L.Ed.2d 1072. In Guinn the Court observed that an Oklahoma "Grandfather Clause" statute could have "no discernible reason other than the purpose to disregard the prohibitions of the [Fifteenth] Amendment," 238 U.S. 347, 363, 35 S.Ct. 926, 931, 59 L.Ed. 1340, although the statute did not specifically declare as its purpose the disenfranchisement of Negroes. The District Court opinion in the Schnell v. Davis case discusses the legislative background of an "understand and explain * * * the Constitution" registration requirement statute for three pages, 81 F.Supp. 872, 878–881, and concludes, at pages 880, 881:

"The defendants argue that the Boswell Amendment is not 'racist in its origin, purpose or effect,' but, as has already been illustrated, a careful consideration of the conditions existing at the time, and of the circumstances and history surrounding the origin and adoption of the Boswell Amendment and its subsequent application, demonstrate that its main object was to restrict voting on a basis of race or color. That its purpose was such is further illustrated by the campaign material that was used to secure its adoption. * * * We cannot ignore the impact of the Boswell Amendment upon Negro citizens because it avoids mention of race or color; 'To do this would be to shut our eyes to what all others than we can see and understand.'"

And this Court has taken note that such inquiry into motive and purpose was a main theme of the Davis case. Orleans Parish School Board v. Bush, 5 Cir., 1957, 242 F.2d 156, 165.

Of course, here, as in Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, supra, the effect of the statute is not only a demonstration of its purpose but is enough to demonstrate its unconstitutionality standing alone. As Justice Black stated for three members of the Court,

"Whether that was due to negligence or was a wilful effort to deprive some citizens of an effective vote, the admitted result is that the Constitutional policy of equality of representation has been defeated." 328 U.S. 549, 572, 66 S.Ct. 1198, 1212, 90 L.Ed. 1432.

### VIII.

The District Court has quoted, and my Brothers have echoed, language from cases to the effect that legislative motive cannot be inquired into. E. g., Doyle v. Continental Ins. Co., 1876, 94 U.S. 535, 24 L.Ed. 148; Shuttlesworth v. Birmingham Board of Education, D.C.Ala.1958, 162 F.Supp. 372. It is necessary to ascertain precisely what they mean by this discussion and quotations. Of course, at this late date, to "overrule" the principle of statutory interpretation would be somewhat like overruling the principle of stare decisis—equally as impossible and undesirable. It is so firmly estab-

lished—and for so long—that a mere quotation from Corpus Juris Secundum is adequate to make the point.

> "Since the intention of the legislature, embodied in a statute, is the law, the fundamental rule of construction, to which all other rules are subordinate, is that the court shall, by all aids available, ascertain and give effect, unless it is in conflict with constitutional provisions, or is inconsistent with the organic law of the state, to the *intention* or *purpose* of the legislature as expressed in the statute." 82 C.J.S. Statutes § 321 (1953). (Emphasis supplied.)

What the Legislature of Alabama, as distinguished from its members, *intended* and what the *purpose* of the Legislature, as distinguished from its members, was in the enactment of this law is then a traditional matter for concern to the Judiciary. Obviously the Legislature of Alabama could have had the purpose of discriminating against Negro voters. Many states have had such purpose as the cases discussed in Part V, *supra*, attest. All that Doyle can mean is that in the judicial process of ascertaining *legislative* purpose and intention the individual motives [31] and expression of the individual members is not pertinent. But where the collective purpose and intention of the body is expressly stated or is ascertained on a trial by the exercise of traditional rules of statutory construction in the light of record facts, the judicial ascertainment and declaration of that purpose and intention is not prohibited by the fact that individual legislators, either in legislative chambers or through the press, may have uttered statements of startling candor.

Of course, to say that "If the State has the power to do an act, its intention or the reason by which it is influenced in doing it cannot be inquired into," Doyle v. Continental Ins. Co., supra, 94 U.S. 535, 541, 24 L.Ed. 148, quoted in Shuttlesworth v. Birmingham Board of Education, supra, 162 F.Supp. 372, 381, is to beg the question. If the sole and exclusive legislative purpose is to deprive citizens of a state of their constitutional rights then the state does not have "the power to do [that] act." Naturally, once this unconstitutional purpose is ascertained, and it is determined that the act is unconstitutional and beyond the power of a state legislature to enact, then it is unnecessary and unwise to try to find *why* the legislature harbored this purpose, to psychoanalyze them individually or collectively, and to try and verbalize the *motive* which prompted them to action.

This was recognized in Doyle, supra, when the Court made this almost self-defeating pronouncement: "The State of Wisconsin * * * is a sovereign State, possessing all the powers of the most absolute government in the world." 94 U.S. 535, 541, 24 L.Ed. 148. That this "most absolute government in the world" was nevertheless subject to some restraints was acknowledged by the parenthetical phrase elipsed purposefully from the quotation just made that "(except so far as its connection with the Constitution and laws of the United States alters its position)" Wisconsin is an absolute sovereign state.

Doyle like Hunter is not really then an aid to decision. Each represents only

---

**31.** For an interesting discussion of the distinction between inquiries into legislative "motive" and legislative "purpose" see N.A.A.C.P. v. Patty, D.C.E.D.Va.1958, 159 F.Supp. 503, 515 n. 6, vacated and remanded for consideration by Virginia courts, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152.

In ordinary usage the shadings of the three terms are subtle. Webster's New International Dictionary (2d ed. 1954): Purpose: "That which one sets before himself as an object to be attained; the end or aim to be kept in view in any plan, measure, exertion or operation; design; intention." Intention: "A determination to act in a certain way or to do a certain thing; purpose; design; as, an *intention* to go to Rome." Motive: "That within the individual, rather than without, which incites him to action; any idea, need, emotion, or organic state that prompts to an action."

the result once it has been concluded that the particular act does not offend the Constitution. Each is a sweeping generalization, the effect of which would be to supplant all constitutional guaranties if literally applied.

### IX.

If the Courts are not open to perform the traditional judicial function of ascertaining *legislative* purpose and intent, then these appellants stand helpless before the law so that, as to the Fifteenth Amendment, in the memorable words of Chief Justice Marshall, " * * * the declaration that the Constitution * * * shall be the supreme law of the land, is empty and unmeaning declamation." M'Culloch v. Maryland, 4 Wheat. 316, 433, 4 L.Ed. 579, 608. The suggestion, implicit if not expressed, that "for protection against abuses by Legislators the people must resort to the polls, not to the Court." Munn v. State of Illinois, 1877, 94 U.S. 113, 134, 24 L.Ed. 77; Williamson v. Lee Optical of Oklahoma, 1955, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563, is here unavailing.

For there can be no relief at the polls for those who cannot register and vote. Significantly the complaint in this case further alleged: "Macon County had no Board of Registrars to qualify applicants for voter registration for more than eighteen months, from January 16, 1956 to June 3, 1957. Plaintiffs allege that the reason for no Macon County Board of Registrars is that almost all of the white persons possessing the qualification to vote in said County are already registered, whereas thousands of Negroes, who possess the qualifications, are not registered and cannot vote." It was this fact, incidentally, which gave rise to the necessity of the dismissal of a cause of action against the Board of Registrars of Macon County for discriminatory practices in registration. United States v. State of Alabama, 5 Cir., 1959, 267 F. 2d 808. In Macon County, of which Tuskegee is a geographical part, neither the Constitution nor Congress nor the Courts are thus far able to assure Negro voters of this basic right.

That this has occurred demonstrates, I think, that the Fifteenth Amendment contemplated a judicial enforcement of its guaranties against either crude or sophisticated action of states seeking to subvert this new right.

If the force of the ballot was to be the sole sanction for the effectual enforcement of the constitutional guaranty, it really created no right and imposed no prohibition. For all that a recalcitrant state need do is neglect the implementing of its own election machinery. If a Court may strike down a law which with brazen frankness expressly purposes a rank discrimination for race, it has—and must have—the same power to pierce the veil of sham and, in that process, judicially ascertain whether there is a proper, rather than an unconstitutional, purpose for the act in question.

The Court denies the existence of that power. The Constitution is left to a majority of the Alabama Legislature.

### X.

As Mr. Justice Frankfurter has recently said elsewhere, "The problem represented by this case is as old as the Union and will persist as long as our society remains a constitutional federalism." Irvin v. Dowd, 1959, 359 U.S. 394, 79 S.Ct. 825, 833, 3 L.Ed.2d 900. State Legislatures are accorded, and rightfully so, great respect and a far ranging latitude in their legislative programs. Occasionally there comes the time, however, when legislation oversteps its bounds. Then "it must * * * yield to an authority that is paramount to the State." State of Wisconsin v. State of Illinois, 1930, 281 U.S. 179, 197, 50 S.Ct. 266, 267, 74 L.Ed. 799 (per Holmes, J.).

In such times the Courts are the only haven for those citizens in the minority. I believe this is such a time.

I respectfully dissent.

WISDOM, Circuit Judge (concurring).

I concur fully in the majority opinion. However, the gravity of the issue, the gulf between the majority and dissenting

opinions, and a few sharp quillets in the dissent impel me to make some observations on the application to the instant case of the doctrine of judicial abstention in political cases.

## I.

The plaintiffs propose a cure worse than the disease. The Court therefore should withhold the exercise of its equity powers. That was Mr. Justice Rutledge's view in an analogous situation. Colegrove v. Green, 1946, 328 U.S. 549, 566, 66 S.Ct. 1198, 90 L.Ed. 1432. That is my view in this case.

An attempt by the federal judiciary to control a state legislature's right to fix the boundaries of a political subdivision is an intrusion of national courts in the polity of a state that in a federal system carries consequences even more serious and far-reaching than the partial disfranchisement of plaintiffs unable to vote in municipal elections because by legislative definition their voting district is not in a municipality. There are other considerations. The plaintiffs ask for something courts cannot give. Courts, any courts, are incompetent to remap city limits. And any decree in this case purporting to give relief would be a sham: the relief sought will give no relief.

There is an obvious reply: in a democratic country nothing is worse than disfranchisement. And there is no such thing as being just a little bit disfranchised. A free man's right to vote is a full right to vote or it is no right to vote. Perhaps so, but in similar situations—to me they are similar—the United States Supreme Court has made no such reply. Instead, in at least two decisions the Supreme Court declined jurisdiction when the relief from partial disfranchisement would require federal courts to intrude in the internal structure and organization of the government of a state. Colegrove v. Green, 1946, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432; South v. Peters, 1950, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834.

When Illinois partially disfranchised the citizens in its seventh congressional district by gerrymandering [1] away ninety per cent of their effective vote as against the vote of Illinois citizens in the fifth congressional district, the Court declined to interfere. Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432. In congressional elections, therefore, 100,000 votes may equal 900,000 votes, and a thirty-five per cent minority may outvote a sixty-five per cent majority (over the state as a whole). Georgia, by the county-unit device, disfranchises citizens of Fulton County (Atlanta) by ninety-nine per cent as against citizens in certain rural counties.[2] When the constitutionality of the system was attacked in the Supreme Court, again the Court held that federal courts should not interfere. South v. Peters, 339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834.

I can see no difference between partially disfranchising negroes and partially disfranchising Republicans, Democrats, Italians, Poles, Mexican-Americans, Catholics, blue-stocking voters, industrial workers, urban citizens, or other groups who are euchered out of their full suffrage because their bloc voting is predictable and their propensity for propinquity or their residence in certain areas, as a result of social and economic pressures, suggests the technique of partial disfranchisement by gerrymander or malapportionment. I can see no difference between depriving negroes of the right to vote in municipal elections in Tuskegee and not counting at their full value votes cast in certain districts in Illinois in a congressional election or

1. The Supreme Court of Illinois invalidated a 1931 reapportionment and ordered a return to the statute of 1901. Moran v. Bowley, 1932, 347 Ill. 148, 179 N.E. 526. Legislative inaction resulted in a gerrymander as effective as any gerrymander created by legislative action reshuffling district lines.

2. For a defense of the system see Henson, The County Unit System is Constitution, 14 Ga.Bar J. 22, (1951).

votes cast in certain counties in Georgia in a state election. The dissenting justices in Colegrove v. Green and in South v. Peters found no sound distinction between those cases and the negro-voting cases.

Colegrove v. Green and South v. Peters may be distinguishable at the periphery. At the center these cases and the instant case are the same. In the respect that Colegrove v. Green involved congressional districts, there was more reason for federal courts to intervene in Illinois' gerrymandering affecting federal elections than there would be to intervene in Alabama's gerrymandering that affects only municipal elections.

No one thinks that in Colegrove v. Green and South v. Peters the Supreme Court gave its constitutional blessing to partial disfranchisement. The Court did not reach the constitutional question. The Supreme Court was willing to assume that malapportionment was unconstitutional. "The Constitution", said Mr. Justice Frankfurter for the majority in Colegrove v. Green, "has many commands that are not enforceable by the courts because they clearly fall outside the conditions and purposes that circumscribe judicial action." [3] In effect, the suit was "an appeal to the federal courts to reconstruct the electoral process of Illinois". Mr. Justice Frankfurter stated: "[T]he petitioners ask of this Court what is beyond its competence to grant. * * * [T]his Court, from time to time, has refused to intervene in controversies * * * because due regard for the effective working of our Government revealed the issue to be

of a peculiarly political nature and therefore not meet for judicial determination." Mr. Justice Rutledge, concurring, stated:

"[The Court has] power to afford relief in a case of this type. * * * But the relief it seeks pitches this Court into delicate relation to the functions of state officials and Congress, compelling them to take action which heretofore they have declined to take voluntarily or to accept the alternative of electing representatives from Illinois at large in the forthcoming elections. * * * If the constitutional provisions on which appellants rely give them the substantive rights they urge, other provisions qualify those rights in important ways by vesting large measures of control in the political subdivisions of the government and the state. * * * I think, therefore, the case is one in which the Court may properly, and should decline to exercise its jurisdiction."

In South v. Peters, 1950, 339 U.S. 276, 70 S.Ct. 641, 642, 94 L.Ed. 834, a majority of the Supreme Court considered that the holding warranted only a short per curiam opinion: "Federal courts consistently refuse to exercise their equity powers in cases posing political issues arising from a state's geographical distribution of electoral strength among its political subdivisions."

Long before these cases the Cherokee Nation asked for an injunction to restrain the State of Georgia and its officials from asserting certain rights and powers over the people of the Cherokee

---

**3.** Mr. Justice Frankfurter continued: "Thus, 'on Demand of the executive Authority,' Art. IV, § 2, of a State it is the duty of a sister State to deliver up a fugitive from justice. But the fulfillment of this duty cannot be judicially enforced. Commonwealth of Kentucky v. Dennison, 24 How. 66, 16 L.Ed. 717. The duty to see to it that the laws are faithfully executed cannot be brought under legal compulsion. State of Mississippi v. Johnson, 4 Wall. 475, 18 L.Ed. 437. Violation of the great guaranty of a re-

publican form of government in States cannot be challenged in the courts. Pacific States Telephone & Telegraph Co. v. State of Oregon, 223 U.S. 118, 32 S. Ct. 224, 56 L.Ed. 377. The Constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights." Colegrove v. Green, 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432.

Nation. In defiance of a treaty between the United States and the Cherokee Nation, Georgia had passed laws dividing the Indian territory into districts and subjecting the Cherokees to the jurisdiction of the state. The Cherokees had the sympathy of almost all Americans. They had no possible haven but the United States Supreme Court. The Court refused to take jurisdiction. Cherokee Nation v. State of Georgia, 1831, 5 Pet. 1, 30 U.S. 1, 8 L.Ed. 25. In the opinion for the Court, Chief Justice John Marshall went out of his way to write, by way of dictum:

> "If courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined. * * * A serious additional objection exists to the jurisdiction of the court. Is the matter of the bill the proper subject for judicial inquiry and decision? * * * The bill requires us to control the Legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interposition by the court may be well questioned. It savors too much of the exercise of political power to be within the proper province of the judicial department."

## II.

With due deference to my able associate, it seems to me that the rhetorical questions in the opening paragraphs of the dissent assume a process of reaching a decision that is inapplicable to political cases. In political cases there are few absolutes and few either-or questions. There may be some matters that clearly fall within the exclusive control of the executive or the legislative branches of government or controversies that these political departments manifestly may settle more appropriately than the judicial department. Courts then apply the doctrine of abstention almost automatically. But since every official act is political in a sense, in most cases courts are driven to inquire. How political? And what are the consequences of granting or denying the relief requested? Because of this and because discretionary equitable powers usually are invoked, courts have considered it proper to take a pragmatic approach and to weigh a variety of considerations in reaching a decision, not stopping, for example, with the flat statement that the issue is political and non-justiciable.[4] A weighing of practical considerations along with broad principles may blur the line between no-jurisdiction and jurisdiction-but-abstention, yet it has characterized political cases since Luther v. Borden, 1849, 7 How. 1, 48 U.S. 1, 12 L.Ed. 581.

To abstain or not to abstain in a hard case that seriously affects the balance between the federal government and the states puts a court to the task of assaying values and assessing effects. Here we must weigh the value, in a federal system, of preserving the integrity of a state as a polity, including a state's control over its political subdivisions and the state administrative process—against the value of an individual's right to vote in city elections when as a consequence of a state law gerrymandering municipal

---

4. In Colegrove v. Green, for example, the Court attached importance to these considerations: the court lacked satisfactory criteria for a judicial determination; the basis for the suit was not a private wrong, but a wrong suffered by Illinois as polity; no court can affirmatively remap the Illinois districts; it is hostile to a democratic system to involve the judiciary in the politics of the people; regard for the Constitution as a viable system precludes judicial correction, since authority for dealing with the problem resides first with Congress and ultimately with the people (to secure a state legislature that will apportion properly); malapportionment is chronic and embroiled in politics, and courts should avoid this political thicket; the Constitution has many commands that are not enforceable but left to legislative or executive action, and ultimately to the people; the possible consequences of decision were of great magnitude and the judicial processes inadequate for dealing with them; in our system of government it is appropriate that Congress have the final determination whether to seat Congressmen.

limits he does not live in a municipality. We must weigh the effects of federal action against inaction, of judicial intervention against self-limitation. This weighing of values and effects is in no sense a play on the word "political". It is a reasonable basis for a decision that may appear indefensible only when the case is sought to be reduced to the single question: did the plaintiff have a constitutional right of which he was deprived or did he not?

### III.

In my judgment, Colegrove v. Green and South v. Peters control this case. Even if they were not controlling, I would favor withholding the exercise of our equity powers for the reasons given and for the following reasons.

(1) Grant of relief would put federal courts in the position of interfering with the internal governmental structure of a state, putting a new kind of strain on federal-state relations already severely strained. Control over the political subdivisions of a state including the incorporation of cities and towns and the determination of their boundaries, is a political function of the state legislature and an attribute of state sovereignty in a federal union. So it has always been held. Let the chips fall where they may, the courts have decided. This is the substance of the holdings in Commissioners of Laramie County v. Com'rs of Albany County, 1876, 92 U.S. 307, 23 L. Ed. 552; Town of Mount Pleasant v. Beckwith, 1879, 100 U.S. 514, 25 L.Ed. 699; and Hunter v. City of Pittsburgh, 1907, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151. In these and similar cases the citizens who suffered from changes in city limits, by loss of property values or by increased taxation (if the boundaries are extended) or from lack of fire and police protection (if the boundaries are contracted) and from loss of voting privileges (in the case of a gerrymander), were in the same situation as the plaintiffs are in this case.

(2) The plaintiffs ask the Court to hold unconstitutional a law that is clearly constitutional on its face. The statutory approach necessary to reach that somewhat unusual result would compel the Court to go beneath the surface of the law and impute to the legislature an unprofessed subjective intention. This ulterior motive, when coupled with inferences from the effect of the law, would then be fatal to the constitutionality of the statute. As Mr. Justice Cardozo put it, this process spreads psychoanalysis to unaccustomed fields. United States v. Constantine, 296 U.S. 287, 299, 56 S.Ct. 223, 80 L.Ed. 233. I recognize that occasionally there may be statutes which are unconstitutional in the light of their effect and the legislature's intentions. Over the long pull, however, I believe that the interests of justice lie in the direction of testing a law in the light of what the law says, not in the light of what the legislature intends. Rather than deviate from that principle in a case involving the exercise of a political function historically lodged with the state and free from federal supervision, I would heed the frequent admonition to avoid a decision upon the constitutional question when there is a tenable alternative ground for disposing of the controversy.

(3) This case differs from all cases involving successful complaints of discrimination under the Fourteenth and Fifteenth Amendments in that there is no effective remedy. An injunction will enable a citizen to vote—if he lives in a voting district where an election is held. It is an empty right when he does not live in a voting district. The best that this Court could do for the plaintiffs would be to declare Act 140 of 1957 invalid. There is nothing to prevent the legislature of Alabama from adopting a new law redefining Tuskegee town limits, perhaps with small changes, or perhaps a series of laws, each of which might also be held unconstitutional, each decision of the court and each act of the legislature progressively increasing the strain on federal-state relations. As stated in Colegrove: "No court can affirmatively remap the Illinois districts. * * * At best we could only declare the existing electoral system invalid."

Nor can this Court remap Tuskegee. If we had the competency to determine the proper geographical limits for towns in Alabama, still there would be no way of our giving effect to the talents of our judges: the plaintiffs' only real remedy is one we have no right to give—a mandamus against the legislature of Alabama.

In short, the situation is unmanageable. If we intervene we shall only intensify the very dispute we are asked to settle. And federal courts have no mission—from the constitution or from that brooding omnipresence of higher law so often an influence on constitutional decisions—to find a judicial solution for every political problem presented in a complaint that makes a strong appeal to the sympathies of the court. To repeat the words of Chief Justice John Marshall: "If courts were permitted to indulge their sympathies, a case better calculated to excite them can scarcely be imagined. * * * [But] such an interposition by the court * * * savors too much of the exercise of political power to be within the proper province of the judicial department."

Parkinson, Circuit Judge, dissented in part.